**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **DAVID G. WALLACE, JR.,** | § | **15-31594-H4-7** |
| Debtor, | § | |
| | § | |
| **RONALD & LAVONNE ELLISOR, RICHARD J.** | § | |
| **KADLICK, RAMESH & SAILAJA KONDURI,** | § | |
| **ROBERT P. FICKS, LARRY & VANITA MULLINS,** | § | |
| **KOHUR SUBRAMANIAN, TIMOTHY B. KOEHL,** | § | |
| **MARTIN GROSBOLL, DOUGLAS & KAY** | § | |
| **SHAFFER, PHILLIP R. & ALISA K. JONES,** | § | |
| **ALLISON CAMERON, M. BRANNON &** | § | |
| **MICHELE KUYKENDALL, KEVIN J. DEERING,** | § | |
| **JOHNNY & BETTY GAUNTT, MARCUS** | § | |
| **ERICKSON, KURT EVERSON, GEORGE &** | § | |
| **MARENE TOMPKINS, TOMPKINS 2007 FAMILY** | § | **Adv. No. 15-____** |
| **PARTNERSHIP, RICHARD BURKHARDT,** | § | |
| **JAMES & PATRICIA STEWART, ROBERT L.** | § | |
| **HORLANDER, JR. & BRENDA K. HORLANDER,** | § | |
| **INDIVIDUALLY AND AS** | § | |
| **HORLANDER, LLC, DONALD L. & MARTHA M.** | § | |
| **KEIL, GERALD CROUCH, INDIVIDUALLY & AS** | § | |
| **GENERAL PARTNER OF POST OAK FAMILY,** | § | |
| **L.P., PAUL E. & SIMONA WILLIAMS, STEPHEN** | § | |
| **C. COOK, FLORENCE REILEY, CARLOS** | § | |
| **BARBERI, RAYMOND L. WARNER, HAL** | § | |
| **TOMPKINS, JOSEPH MILLER, INDIVIDUALLY** | § | |
| **& D/B/A NADA POR NADA, LTD., ELLIS V.** | § | |
| **COUCH, ANITA CHANDLER, JOHN WILLIS,** | § | |
| **EXECUTOR OF THE ESTATE OF GERALDINE** | § | |
| **WILLIS, GARY SEEVER, GEORGE** | § | |
| **LINGENFELDER, LAWRENCE ROOT, FRED** | § | |
| **SHUFFLER, ROBERT RESCH, SANJIV & RENU** | § | |
| **KHANNA, DON & DONNA BARRETT, ED &** | § | |
| **HELEN GRAY, BARBARA DOREEN HOUSE, and** | § | |
| **ZT PERRY FUND, L.P.** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DAVID G. WALLACE, JR.,** | § | |
| | § | |
| Defendant. | § | |

-1-

**COMPLAINT EXCEPTING DEBTS FROM DISCHARGE UNDER 11 USC SECTION 523**

TO THE HON. JEFF BOHM
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Come now, Ronald & Lavonne Ellisor, Richard J. Kadlick, Ramesh and Sailaja  Konduri, Robert P. Ficks, Larry & Vanita Mullins, Kohur Subramanian, Timothy B. Koehl, Martin Grosboll, Douglas & Kay Shaffer, Phillip R. & Alisa K. Jones, Allison Cameron, M. Brannon & Michele Kuykendall, Kevin J. Deering, Johnny & Betty Gauntt, Marcus Erickson, Kurt Everson, George & Marene Tompkins, Tompkins 2007 Family Partnership, Richard Burkhardt, James & Patricia Stewart, Robert L. Horlander, Jr. & Brenda K. Horlander, Individually and as Members of Horlander, LLC, Donald L. & Martha M. Keil, Gerald Crouch, Individually and as General Partner of Post Oak Family, L.P., Paul E. & Simona Williams, Stephen C. Cook, Florence Reiley, Carlos Borbero, Raymond L. Warner, Hal Tompkins, Joseph Miller, Individually & d/b/a Nada Por Nada, Ltd., Ellis V. Couch, Sean F. Reed, Anita Chandler, and John Willis, Executor of the Estate of Geraldine Willis, George Lingenfelder, Gary Seever, Dr. Lawrence Root, Fred Shuffler, Robert Resch, Sanjiv & Renu Khanna, Don & Donna Barrett, Ed & Helen Gray, and Barbara Doreen House and ZT Perry Fund, L.P. (hereinafter "Plaintiffs") in the above-styled and numbered cause, and file this Complaint Excepting Debts From Discharge Under 11 USC Sections 523(a)(2)(A), (a)(4) and (a)(19) and would show unto the Court as follows:

## I. JURISDICTION

1.      This Court has jurisdiction over the causes of action asserted in this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J) and the general order of reference.

2.      The causes of action asserted herein constitute core proceedings.  This adversary proceeding relates to the Chapter 7 case of David G. Wallace, Jr., Case No. 15-31594-H4-7,

pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.  Plaintiffs consent to the entry of final orders and judgments by the bankruptcy court on the discharge issues in this adversary proceeding, if it is later determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## II.  PARTIES

3.      Defendant David G. Wallace, Jr. is the Debtor in this case and can be served at the address set forth in his bankruptcy petition at 1634 Brookstone Lane, Sugar Land, Texas 77479 and through his attorney of record, Ms. Janet Casciato-Northrup, Hughes, Watters & Askanase, LLP, 333 Clay, Suite 2900, Houston, Texas 77002.

4.      Plaintiffs, Ronald and Lavonne Ellisor, are residents of Houston, Harris County, Texas.

5.      Plaintiff, Richard J. Kadlick, is a resident of Houston, Harris County, Texas.

6.      Plaintiff, Ramesh and Sailaja Konduri, are residents of Houston, Harris County, Texas.

7.      Plaintiff, Robert P. Ficks, is a resident of Sugar Land, Fort Bend County, Texas.

8.      Plaintiffs, Larry & Vanita Mullins, are residents of Angleton, Brazoria County, Texas.

9.      Plaintiff, Kohur Subramanian, is a resident of Sugar Land, Fort Bend County, Texas.

10.     Plaintiff, Timothy B. Koehl, is a resident of Houston, Harris County, Texas.

11.     Plaintiff, Martin Grosboll, is a resident of Kingwood, Harris County, Texas.

12.     Plaintiffs, Douglas & Kay Shaffer, are residents of Bacliffe, Galveston County, Texas.

13.     Plaintiffs, Phillip R. and Alisa K. Jones, are residents of Spring, Harris County, Texas.

14.     Plaintiff, Allison Cameron, is a resident of Dallas, Dallas County, Texas.

15.     Plaintiffs, M. Brannon and Michele Kuykendall, are residents of The Woodlands, Montgomery County, Texas.

16.     Plaintiff, Kevin J. Deering, is a resident of Argyle, Denton County, Texas.

17.     Plaintiffs, Johnny and Betty Gauntt, are residents of Pasadena, Harris County, Texas.

18.     Plaintiff, Marcus Erickson, is a resident of Missouri City, Fort Bend County, Texas.

19.     Plaintiff, Kurt Everson, is a resident of Missouri City, Fort Bend, Texas.

20.     Plaintiffs, George and Marene Tompkins and Tompkins 2007 Family Partnership are residents of Houston, Harris County, Texas.

21.     Plaintiff, Richard Burkhardt, is a resident of Malakoff, Henderson County, Texas.

22.     Plaintiff, James and Patricia Stewart, are residents of San Antonio, Bexar County, Texas.

23.     Plaintiffs, Robert L. Horlander, Jr. and Brenda K. Horlander, Individually and as Horlander, LLC, are residents of Houston, Harris County, Texas.

24.     Plaintiff, Donald and Martha M. Keil, are residents of Seguin, Guadalupe County, Texas.

-4-

25.     Plaintiff, Gerald Crouch, Individually and as the General Partner of Post Oak Family, L.P., is a resident of Shavano Park, Bexar County, Texas.

26.     Plaintiffs, Paul E. and Simona Williams, are residents of Houston, Harris County, Texas.

27.     Plaintiff, Stephen C. Cook, is a resident of Houston, Harris County, Texas.

28.     Plaintiff, Florence Reiley, is a resident of Bellaire, Antrim County, Michigan.

29.     Plaintiff, Carlos Barberi, is a resident of Katy, Harris County, Texas.

30.     Plaintiff, Raymond L. Warner, is a resident of Spring, Harris County, Texas.

31.     Plaintiff, Hal Tompkins, is a resident of Harris County, Texas.

32.     Plaintiff, Joseph Miller, Individually and d/b/a Nada Por Nada, Ltd., is a resident of Bexar County, Texas.

33.     Plaintiff, Ellis V. Couch is a resident of Tulsa, Oklahoma.

34.     Plaintiff, Anita Chandler, is a resident of Baytown, Harris County, Texas.

35.     Plaintiff, John Willis, Executor of the Estate of Geraldine Willis, is a resident of Houston, Harris County, Texas.

36.     Plaintiff, George Lingenfelder, is a resident of Katy, Harris County, Texas.

37.     Plaintiff Gary Seever, is a resident of Houston, Harris County, Texas.

38.     Plaintiff, Dr. Lawrence Root is a resident of Houston, Harris County, Texas.

39.     Plaintiff, Fred Shuffler is a resident of Houston, Harris County, Texas.

40.     Plaintiff Robert Resch is a resident of Summerville, South Carolina.

41.     Plaintiffs Sanjiv & Renu Khanna are residents of Houston, Harris County, Texas.

42.     Plaintiffs Don Barrett and Donna Barrett are residents of Houston, Harris County, Texas.

43.     Plaintiffs Ed Gray and Helen Gray are residents of Harris County, Texas.

44.     Plaintiff Barbara Doreen House is a resident of Houston, Harris County, Texas.

45.     Plaintiff ZT Perry Fund, L.P., is a Texas limited partnership with its principal place of business in Houston, Harris County, Texas.

46.     The WBL Partnership Plaintiffs are individuals who owned equity in the WBL Partnerships.  The WBL Partnership Plaintiffs include Ron & Lavonne Ellisor, Carlos Barberi, Richard Burkhart, Anita Chandler, Steve Cook, Ellis Couch, Gerald Crouch, Individually and as the General Partner of Post Oak Family, L.P., Kevin Deering, Marcus Erickson, Kurt Everson, Robert Ficks, Ed & Helen Gray, Martin Grosboll, Robert L. and Brenda K. Horlander, Individually and as Horlander, LLC, Barbara Doreen House, Philip & Alisa Jones, Richard Kadlick, Donald & Martha Keil, Sanjiv & Renu Khanna, Tim Koehl, Ramesh & Sailaja Konduri, Joseph Miller, Individually and d/b/a Nada Por Nada, Ltd., Robert Resch, Lawrence Root, Gary Seever, Doug & Kay Shaffer, Fred Shuffler, James & Pat Stewart, Kohur Subramanian, George & Marene Tompkins and the Tompkins 2007 Family Partnership, Howell Tompkins, Paul & Simona Williams, Allison Cameron, M. Brannon & Michele Kuykendall, Barbara Doreen House, George Lingenfelder, ZT Perry Fund.   The WBL Partnership Plaintiffs lost approximately $11,000,000 from equity investments in the WB Companies for which they have a claim against the Debtor.

47.     The WBL Note Plaintiffs are individuals who loaned money to WBDP or one of the WB Companies.  The WBL Note Plaintiffs include Ron & Lavonne Ellisor, Steve Cook, Gerald Crouch, Individually and as the General Partner of Post Oak Family, L.P., Kevin Deering, Marcus Erickson, Robert Ficks, Johnny & Bette Gauntt, Ed & Helen Gray, Martin Grosboll, Philip & Alisa Jones, Richard Kadlick, Tim Koehl, Ramesh & Sailaja Konduri, Larry

& Vanita Mullins, Florence Reiley, Doug & Kay Shaffer, Fred Shuffler, James & Pat Stewart, Kohur Subramanian, George & Marene Tompkins and Tompkins 2007 Family Partnership, Raymond Warner, Paul & Simona Williams, John Willis, Executor of the Estate of Geraldine Willis, Allison Cameron, M. Brannon & Michele Kuykendall, and Barbara Doreen House.  The WBL Note Plaintiffs lost approximately $4,500,000.00 in connection with loans made to the WB Companies for which they have a claim against the Debtor.

48.     The BizRadio Equity Plaintiffs are individuals who purchased equity in the BizRadio entities.  The BizRadio Equity Plaintiffs include Ron & Lavonne Ellisor, Carlos Barberi, Richard Burkhart, Kevin Deering, Marcus Erickson, Kurt Everson, Ed & Helen Gray, Martin Grosboll, Philip & Alisa Jones, Joseph Miller, Individually and d/b/a Nada Por Nada, Ltd., James & Pat Stewart, George & Marene Tompkins and Tompkins 2007 Family Partnership, and Paul & Simona Williams, Allison Cameron, and M. Brannon & Michele Kuykendall, and Barbara Doreen House.  The BizRadio Equity Plaintiffs lost approximately $3,200,000.00 from equity investments into the BizRadio companies for which they have a claim against the Debtor.

49.     The KCM Note Plaintiffs include individuals who purchased KCM promissory notes.  The KCM Note Plaintiffs include Ron & Lavonne Ellisor, Carlos Barberi, Anita Chandler, Steve Cook, Kurt Everson, Ed & Helen Gray, Martin Grosboll, Robert L. and Brenda K. Horlander, Individually and as Horlander, LLC, Philip & Alisa Jones, Sanjiv & Renu Khanna, Gary Seever, Doug & Kay Shaffer, Kohur Subramanian, and Paul & Simona Williams, Allison Cameron, M. Brannon & Michele Kuykendall, and Barbara Doreen House.  The KCM Note Plaintiffs lost approximately $4,400,000.00 from loans made to Kaleta Capital Management for which they have a claim against the Debtor.

### III. FACTUAL BACKGROUND

50.     The Debtor, David Wallace, was an officer, manager and control person of Wallace Bajjali Development Partners, L.P. ("WBDP"), Wallace Bajjali Investment Fund II, L.P., ("WBIF II"), Laffer Frishberg Wallace Economic Opportunity Fund, L.P. ("LFW Fund") and West Houston WB Realty Fund, L.P. f/k/a WC Perry Properties Realty Fund, L.P. ("West Houston Fund").   WBIF II, LFW Fund, and West Houston Fund were three real estate partnerships that raised money from investors to fund purchases of real estate for development and sale.  WBDP was a management company that did not directly own real estate assets.  On May 26, 2009 the real estate assets of WBIF II, LFW Fund and the West Houston Fund were contributed to WB Real Estate Holdings, L.L.C. ("WB Holdings") in exchange for ownership interests in WB Holdings.  (WBIF II, LFW Fund, West Houston Fund, and WB Holdings collectively referred herein to as the "WBL Partnerships").  The WBL Partnerships, WBDB, and their affiliated companies are referred to herein collectively as "WB."

51.     To grow the WBL Partnerships and continue buying real estate, David Wallace and his partners needed a pipeline of new capital from individual investors, who purchased limited partnership interests in the WBL Partnerships and made loans to the WBL Partnerships as well as WBDP.

52.     At the center of this dispute are the now defunct Business Radio Network, L.P. d/b/a BizRadio and its affiliates ("BizRadio").  BizRadio was a network of radio stations that broadcasted and marketed financial and economic programing designed to attract investors and lenders for its principals, Al Kaleta, Dan Frishberg, and David Wallace.  The capital that came in from the radio broadcasts was managed by Daniel Frishberg Financial Services, Inc. ("DFFS"), and was invested in or loaned to BizRadio, Kaleta Capital Management ("KCM"), and the

Wallace Bajjali Companies ("WB").  KCM, DFFS, and WB used BizRadio as a platform to market their investment businesses.

53.     BizRadio was a financial disaster as a stand-alone entity, losing millions each year.  Indeed, the only value in BizRadio was the pipeline of new investors that it attracted to KCM, DFFS and WB.  BizRadio was simply the fuel for two Ponzi schemes whose survival was predicated on the continual investment of substantial new capital each year to fund millions in annual losses and to provide fresh capital for Frishberg, Kaleta, and Wallace.  Investors' funds raised by Frishberg and Kaleta, flowed freely to the financially insecure BizRadio in a desperate attempt to keep the BizRadio pipeline of new investors open so that they could be steered to KCM, DFFS and WB.

54.     As long as BizRadio was self-sufficient, that is, new investors continued to agree to invest in KCM and BizRadio, there was no need for Wallace to get involved in the scams.  However, two things started happening in 2006: (1) BizRadio's and KCM's losses started to exceed their ability to bring in more capital; and (2) WB's desire to bring in more investors to buy more real estate grew.  As BizRadio and KCM started to collapse under the weight of their own Ponzi scheme, Frishberg told Wallace that the WB entities needed to start providing additional capital to BizRadio, or the station would have to go off the air, ending the pipeline of capital that had been flowing to WB.  So, WB began taking investments from individuals on the premise that funds would be used to purchase real estate, but it used a portion of the money to "invest" in BizRadio, propping up the pipeline.  Over time, the amount of cash that flowed back to BizRadio grew and grew, until ultimately the SEC discovered the Frishberg/Kaleta Ponzi Scheme, and imposed a receivership over BizRadio and KCM.

55.     In September 2006, WBIF II made its first investment in BizRadio in the form of advancing convertible Promissory Notes.   By December 31, 2006, WBIF II had advanced $1,493,170.00 to BizRadio, and by June 30, 2007 the invested balance in a failing BizRadio was up to $3,157,170.00.   The WBL Partnerships and their affiliates would eventually fraudulently invest many millions more of Plaintiffs' money into BizRadio.   By mid-2008, the mounting BizRadio losses were so substantial that WB started running out of cash.   The situation was complicated by the collapse of the real estate market and the inability of the WB partnerships to borrow money.   With cash flow shortages spiraling out of control, Wallace caused certain successful special-purpose entities that were subsidiaries of the WBL Partnerships, to transfer cash to other special-purpose entities that were failing.   Nothing would have been wrong with this, so long as the ownership of each partnership was the same.   However, without disclosing these actions to the investors, Wallace made these transfers on a regular basis.   Ultimately, in a tacit admission that he had breached his fiduciary duty to the investors, Wallace caused the three WBL Partnerships to merge into a single holding company (WB Holdings).   At the time of this merger, Wallace did not fully and accurately disclose to the lenders and investors in the various WB Companies the cash transfers that had already taken place, did not disclose the financial condition of the portfolio of entities, and did not fairly and accurately value the different partnership interests.

56.     At all relevant times, there was a close relationship between the Debtor and his co-conspirators who controlled BizRadio (Daniel Frishberg and Albert Kaleta).   For an extended period of time, the Wallace Bajjali companies shared office space with DFFS and Biz Radio. David Wallace appeared countless times on Frishberg's radio show and at his seminars, vouching for Frishberg's investment expertise and pitching his real estate partnerships to

listeners, followers, and attendees.  Wallace was likewise at times an officer, director and/or advisory board member of BizRadio.

57.     Frishberg and Kaleta were investment counselors, and Frishberg was an on-air personality for BizRadio touting DFFS, KCM, BizRadio, and Wallace Bajjali and their investment strategies.  The BizRadio and KCM/DFFS businesses, however, were a simple Ponzi scheme.  Money was freely commingled between these businesses without proper documentation or accounting.  BizRadio never generated sufficient revenue through the sale of airtime to keep itself a viable entity.  Instead, the Frishbergs and Albert Kaleta redirected business opportunities that came from the radio station to their personal companies, KCM and DFFS, and to their co-conspirator – David Wallace.  BizRadio was able to exist solely through the continuous influx of additional capital each year until it eventually collapsed upon itself when Wallace, Frishberg, and Kaleta were no longer able to dupe new investors because of Securities and Exchange Commission ("SEC") charges.  Even after the SEC placed KCM and DFFS and BizRadio in Receivership, Messrs. Kaleta, Frishberg, and Wallace continued to maintain that the SEC Receivership would be resolved and that BizRadio would recover.

58.     Early on, Wallace was aware, or should have been aware, that BizRadio as a company was unable to support itself and was simply a "loss leader" for DFFS's, KCM's and WB's investment opportunities.  Plaintiffs, who often were already investors in one or more of these investments, were repeatedly solicited for additional investments in BizRadio or the WBL Partnerships with promises of returns which Wallace knew were not possible except through a continued Ponzi scheme. Wallace continued to provide funding to BizRadio through funds invested in the WBL Partnerships and their affiliates, or by facilitating direct loans to or investments in KCM or BizRadio to the detriment of the Plaintiffs to whom he owed a fiduciary

duty, long after he was aware that the promised returns were false and that BizRadio, the Frishbergs and Kaleta were perpetrating a fraud on the investors.  The Debtor and the WBL Partnerships relied on BizRadio's broadcasts to bring new investors to their real estate businesses.  As a result, it made sense for them to continue sending investors' money to BizRadio to keep the station "on the air," and to keep the pipeline of new investors flowing. Each of the Plaintiffs in this case was one of the defrauded investors that came through that pipeline.

59.    On November 13, 2009, the SEC commenced an action against Kaleta and his investment fund, KCM, alleging multiple violations of the antifraud provisions of the federal securities laws arising from the fraudulent offering of promissory-note securities. Beginning in December 2007, Kaleta -- with the aid of Dan Frishberg and the Debtor-- raised capital for BizRadio from the sale of promissory notes ("KCM Notes") to the KCM Note Plaintiffs.  KCM sold more than $10 million of the KCM Notes to Plaintiffs and others.  The vast majority of the proceeds of the KCM Notes, similar to Plaintiffs' other investments, funded the operations of BizRadio, DFFS, KCM, the WBL Partnerships, and other related entities.  This was directly contrary to Kaleta's and Frishberg's representations that the funds would be used to make high interest, short-term loans to credit-worthy small businesses.  Instead, funds were freely transferred between and among BizRadio, KCM, and the WB Companies without regard to the transferee's ability to repay the loans.

60.    A Receiver was ultimately appointed for KCM and the Receivership was later expanded to include BizRadio and Frishberg's investment fund, DFFS. The SEC filed additional enforcement actions including SEC v. David Gordon Wallace Jr. and Costa Bajjali, Civil Action No. 4:11-cv-1932, in the United States District Court for the Southern District of Texas, Houston

Division, alleging violations of §17(a)(2) and (3) of the Securities Act of 1933 (the "Securities Act").  The basis of the SEC's action was "funds fraudulently obtained by KCM from investors, and other tort claims related to the business dealings between certain "Wallace Bajjali Parties" and Frishberg and Kaleta.  In May of 2011, the Debtor personally agreed to pay a civil fine as a result of the SEC enforcement action, and is subject to an injunction barring him from committing further violations of Section 17(a) of the Securities Act of 1933.

61.    In connection with raising money for his real estate funds, Wallace reviewed and approved a private-placement memorandum ("PPM") containing information for investors about the WBIF II securities offerings. In the offering, Wallace and Bajjali distributed the PPM to investors personally and through Kaleta and Frishberg. The PPM said the Wallace-Bajjali Fund would invest no more than 33% of the offering proceeds in any one business. By May 2007, the Wallace-Bajjali Fund had received offering proceeds of approximately $16 million and had invested more than $6.5 million of those proceeds in BizRadio. As a result, more than 40% of the Wallace-Bajjali Fund offering proceeds at the time was invested in BizRadio, far exceeding the PPM's 33% limit.

62.    At the end of 2007, Wallace and his partners created the LFW Economic Opportunity Fund, again primarily to invest in real estate projects. Wallace marketed the LFW Fund through Frishberg and Kaleta. According to the LFW Fund PPM, which Wallace reviewed and approved for distribution to investors, the LFW Fund would limit investment in any one business to 20% of the Fund's offering proceeds. The PPM further provided that the 20% ratio had to be in place when the fund closed to new investment.  By the time the Opportunity Fund closed in December 2008, it had raised approximately $7 million. Of that amount, it had invested approximately $4 million in BizRadio—approximately 57% of the offering proceeds—far

exceeding the 20% investment limit. Wallace knew that, by investing so much in BizRadio, the WBIF II Fund and the LFW Fund had exceeded the investment limits stated in the respective PPMs. As the person in charge of the Funds, Wallace should have taken steps to ensure the Funds invested within the limits provided in the PPMs and within reasonable limits to protect the real estate investments. These limits signified a certain level of diversification, such that the Funds' risk of loss from any single investment would be minimized. Because the Funds exceeded the investment limits in BizRadio, investors were forced to take on much greater investment risk than Wallace and Bajjali disclosed in the PPMs.  Ultimately, BizRadio, DFFS, KCM, and the WBIF II and LFW Funds failed.  The collapse of those companies caused the collapse of Wallace's other businesses and damaged Plaintiffs in an amount in excess of $20 million.

## IV. RELIEF REQUESTED

### A.  §523(a)(2)(A) Claims

63.    The Debtor committed fraud against Plaintiffs, which justifies an exception to discharge.  Title 11 USC section 523(a)(2)(A) provides:

> "(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-…
>
>      (2)      For money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>           (A)      False pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition"

64.    "For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a

loss as a proximate result of its reliance." *In re Acosta*, 406 F3d 367, 372(5th Cir. 2005)(citations omitted). Further, "Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Id*. (citations omitted).

65.     Wallace made the following representations to the WBL Partnership Plaintiffs and the WBL Note Plaintiffs:

    a.  That the WBIF II Fund would invest no more than 33% of its capital in any one investment;

    b.  That the LFW Fund would invest no more than 20% of its capital in any one investment;

    c.  At the point that the LFW Fund closed to new investors, it would not own more than 20% in any one investment;

    d.  That investments in BizRadio would generate returns for the LFW Fund and WBIF II;

    e.  That the special purpose entities set up by the WBL Partnerships were being managed separately for the good of each entity;

    f.  That the merger of the WBL Partnerships into WB Holdings was fair to the limited partners of the WBL Partnerships;

    g.  That positive cash flow, if any, from real estate or other investments was being used to pay down debt of the relevant partnership;

    h.  That Wallace and his partners had not, and would not, receive money from the WB Companies until investors received their stated returns;

    i.  That the LFW Fund was a viable business;

    j.  That WBIF II was a viable business; and

    k.  That the West Houston fund was a viable business.

Wallace made the following Representations to all Plaintiffs:

    a.   That Daniel Frishberg was a financial advisor who achieved positive returns for his clients;

    b.   That Daniel Frishberg could be trusted to recommend sound investments for his clients;

    c.   That Al Kaleta could be trusted to recommend sound investments for his clients;

    d.   That investments in BizRadio would generate returns for individual investors;

    e.   That BizRadio was a viable business;

    f.   That KCM was a viable business; and

    g.   That KCM made loans to multiple companies in multiple industries to achieve diversification of risk.

66.    When the above representations were made, Wallace knew they were false. Wallace made the above representations with the intent to deceive the Plaintiffs. The Plaintiffs actually and justifiably relied on the representations. The Plaintiffs sustained the losses described above in Section II as a proximate result of their reliance on the representations.

67.    When promoting the various investments described herein, Wallace failed to disclose material facts that were of critical importance to all Plaintiffs, including, but not limited to:

    a.   That funds invested or loaned to the WBL Partnerships were being invested in and loaned to BizRadio;

    b.   That BizRadio was insolvent;

    c.   That BizRadio was part of a Ponzi scheme;

    d.   That BizRadio was a "loss leader" for the Wallace's and his partners' businesses;

    e.   That BizRadio had ownership interests in the WBL Partnerships.

    f.   That Wallace and his Funds had ownership stakes in BizRadio;

g.  That Wallace was paid to promote BizRadio, the KCM Notes, and Messrs. Frishberg and Kaleta;

h.  That the WBL Partnerships received most of their capital from BizRadio and DFFS;

i.  That Wallace and his Funds had a conflict of interest in dealing with BizRadio because of the mutually dependent relationship between the two groups of entities;

j.  That more than 33% of the WBIF II's assets and more than 20% of the LFW Fund's assets were being invested in BizRadio; and

k.  That much of investors' funds invested in BizRadio were being used to pay down original purchase money debt for the radio station rather than furthering a viable business plan.

68.     Each of the above facts, if accurately disclosed to the Plaintiffs, would have been material to Plaintiffs' investment decisions and would have caused those Plaintiffs to refrain from making investments in or loans to WB, BizRadio, or KCM.  Plaintiffs suffered damage as a result of Wallace's failure to disclose the above material facts.  Collectively, Plaintiffs lost approximately $24,500,000.00 as a result of Wallace's frauds for which Plaintiffs have claims against the Debtor.  The specific losses by category of investment are set forth in Section II above.

## B.  Breach of Fiduciary Duty & Defalcation

69.     Title 11 USC section 523(a)(4) provides:

"(a)     A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt---
        (4)     for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…"

"This bar to discharge reaches 'debts incurred through abuses of fiduciary positions . . . [and] involv[ing] debts arising from the debtor's acquisition or use of property that is not the debtor's.'" *In re Harwood*, 637 F3d 615, 619 (5th Cir. 2011) (citation and internal quotation

marks omitted). An officer of a corporate general partner, who exercises control over the affairs of the partnership, satisfies the fiduciary standard of section 523(a)(4).  As held by the 5th Circuit in the *Harwood* case, "We agree with the bankruptcy and district courts that the board's entrustment in Harwood of the management of the partnership's affairs and the partners' investments, when combined with the practically complete control that Harwood actually exercised over the partnership's management, compels a conclusion that Harwood stood "in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust." *McBeth*, 565 F.3d at 177 (quoting *Crenshaw*, 611 S.W.2d at 890). In the circumstances of this case, we find that Harwood acted "in a fiduciary capacity" to within the meaning of Section 523(a)(4)." *Id* at 624.

70.    David Wallace was an officer, director, manager, and/or dominant control person of the WBDP, the WBL Partnerships, WB Holdings, and their related companies.  Wallace and his partner, Costa Bajjali, controlled the general partner of the WBL Partnerships.  Wallace, therefore, was a fiduciary of the WBL Partnership Plaintiffs and WBL Note Plaintiffs.

71.    Because Wallace owed the Plaintiffs such duties, a presumption of unfairness attaches to the Plaintiffs' investments in and loans to the WBL Partnerships (which benefited Wallace by keeping the insolvent BizRadio -- and its confederates Kaleta and Frishberg -- in business to secure more funding for the WB Companies) which cannot be overcome unless Wallace proves:

    (i)    The loans to and/or investment in WBL Partnerships were fair and equitable to the Plaintiffs;

    (ii)   Wallace made reasonable use of the confidence the Plaintiffs placed in him;

    (iii)  Wallace acted in utmost good faith and executed the most scrupulous honesty toward the Plaintiffs;

(iv)     Wallace placed the Plaintiffs' interests above his own.

(v)      Wallace did not place himself in any position in which his self-interest might conflict with his obligations as fiduciary; and

(vi)     Wallace fully and fairly disclosed in a timely manner all material information concerning BizRadio, KCM, and the WBL Partnerships to Plaintiffs who purchased notes or equity interests.

72.      Wallace cannot prove any of these requirements. Indeed, the opposite is true in each and every case.  Thus, the transactions at issue are tainted with breaches of fiduciary duty.

73.      Further, Wallace breached his duties to Plaintiffs through misrepresentations regarding the quality and nature of the investments and the character of the individuals and entities involved, and/or in failing to disclose material facts regarding the quality and nature of the investments and the character of the individuals and entities involved.  Wallace knew or should have known that BizRadio, in which a large percentage of WB's assets was invested, was not generating revenue sufficient to maintain its operations.   Despite this knowledge and obligation to disclose such information to the Plaintiffs, Wallace said nothing and allowed these Plaintiffs' loans and investments be wasted with no reasonable expectation of recovery. Likewise, Wallace knew that many of the Plaintiffs had already invested significant sums in BizRadio, but failed to disclose to investors that money entrusted to WBL Partnerships was also being redeployed to BizRadio to prop up the scheme.

74.      Wallace made profits from new clients by soliciting and acquiring money for BizRadio and the WBL Partnerships Plaintiffs, which continued even after they had knowledge that BizRadio and certain other investments in the WBL Partnerships were insolvent.  Wallace had an obligation to disclose these facts to the WBL Partnership Plaintiffs and a duty to fully apprise them of the risks in proceeding with these transactions with BizRadio and the WBL

Partnerships.  Instead of alerting these Plaintiffs, Wallace conspired with BizRadio, Al Kaleta, and Daniel Frishberg to continue raising funds for a hopelessly insolvent BizRadio.  Wallace and his partners, directly and through the WBL Partnerships, obtained financial benefit from these transactions at the same time knowing that the WBL Partnerships' investments would be lost.

75.     In addition, defalcation under section 523(a)(4) has been defined as "'a willful neglect of duty, even if not accompanied by fraud or embezzlement.'" *Id.* at 624, quoting *Moreno*, 892 F.2d at 421. "Willful neglect 'does not require actual intent, as does fraud,' and is 'essentially a recklessness standard.' *Id.,* quoting *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997). "Willfulness in this context 'is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known.' *Id.* Quoting *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001).

76.     Wallace's willful neglect in failing to disclose the financial situation of BizRadio and KCM, to disclose the size of WB's loans to and investments in BizRadio, to disclose his and WB's association with Frishberg, Kaleta, and BizRadio, and to disclose the financial risks to WB from its substantial exposure to BizRadio constitutes defalcation under Section 523(a)(4), and the debt owed to Plaintiffs for their investment losses warrants an exception from discharge.

77.     The WBL Partnership Plaintiffs and WB Note Plaintiffs suffered damage as a result of Wallace's defalcation and breach of fiduciary duty.  Collectively, Plaintiffs lost approximately $24,500,000.00 as a result of Wallace's defalcation and breach of fiduciary duty, for which Plaintiffs have claims against the Debtor.  The specific losses by category of investment are set forth in Section II above.

## C.  Securities Fraud

78.     Title 11 USC section 523(a)(19) provides:

"(a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt---

"(19)   that--

(A)    is for--

(i)    the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii)    common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B)    results, before, on, or after the date on which the petition was filed, from--

(i)    any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii)    any settlement agreement entered into by the debtor; or

(iii)    any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor."

Under section 523(a)(19), "After the amendment to § 523(a)(19) in BAPCPA, the bankruptcy court can satisfy the requirement of either § 523(a)(19)(B)(i) or (B)(iii) by conducting a federal judicial proceeding and issuing '[a]judgment, order, consent order, or decree' or '[a]…court order… for damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor." See 11 U.S.C. § 523(a)(19)(B). This is the same type of determination that bankruptcy courts already make in subsections (2), (4) and (6) of §523." *In re Jansma*, 2010 Bankr. LEXIS 235, *13 (Bankr. N.D. Ill. Jan. 22, 2010). Further, "This court can satisfy subsection (B) of § 523(a)(19) by issuing a judgment that [Defendant] violated subsection (A). Therefore, [Plainitff] does not need to provide factual content that subsection (B) is satisfied." *Id* at *15.

-21-

**Violation of §10(b) of the 1934 Securities Act and Rule 10b-5**

79.     Wallace directly and acting in concert with Dan Frishberg, Al Kaleta, and Costa Bajjali, disseminated or approved the false statements below, which he knew were misleading or deliberately disregarded whether they were misleading to investors.  Further, Wallace failed to disclose material facts necessary in order to make the other statements made, in light of the circumstances in which they were made, not misleading.

80.     Wallace violated §10(b) of the 1934 Act and Rule 10b-5 in that he:

       a.  employed devices, schemes, and artifices to defraud;

       b.  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

       c.  engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of equity interests in WB and BizRadio and their loans to WB and KCM.

81.     Wallace made the following representations to the WBL Partnership Plaintiffs and the WBL Note Plaintiffs:

       a.  That the WBIF II Fund would invest no more than 33% of its capital in any one investment;

       b.  That the LFW Fund would invest no more than 20% of its capital in any one investment;

       c.  At the point that the LFW Fund closed to new investors, it would not own more than 20% in any one investment;

       d.  That the special purpose entities set up by the WBL Partnerships were being managed separately for the good of each entity;

       e.  That the merger of the WBL Partnerships into WB Holdings was fair to the limited partners of the WBL Partnerships;

       f.  That positive cash flow, if any, from real estate or other investments was being used to pay down debt of the relevant partnership;

g.   That Wallace and his partners had not, and would not, receive money from the WB Companies until investors received their stated returns;

h.   That Daniel Frishberg was a financial advisor who achieved positive returns for his clients;

i.   That Daniel Frishberg could be trusted to recommend sound investments for his clients;

j.   That Al Kaleta could be trusted to recommend sound investments for his clients;

k.   That investments in BizRadio would generate returns for individual investors;

l.   That investments in BizRadio would generate returns for the LFW Fund and WBIF II;

m.   That BizRadio was a viable business;

n.   That KCM was a viable business;

o.   That the LFW Fund was a viable business;

p.   That WBIF II was a viable business; and

q.   That the West Houston fund was a viable business.

82.   When promoting the WBL Partnerships as investments, Wallace failed to disclose material facts that were of critical importance to the WBL Partnership Plaintiffs and WBL Note Plaintiffs, including, but not limited to:

a.   That funds invested or loaned to the WBL Partnerships were being invested in and loaned to an insolvent BizRadio;

b.   That BizRadio was part of a Ponzi scheme;

c.   That BizRadio was a "loss leader" for the Wallace's and his partners' businesses;

d.   That BizRadio had ownership interests in the WBL Partnerships.

e.   That Wallace and his Funds had ownership stakes in BizRadio;

f.   That Wallace was paid to promote BizRadio, the KCM Notes, and Messrs. Frishberg and Kaleta;

-23-

g.  That the WBL Partnerships received most of their capital from BizRadio and DFFS;

h.  That Wallace and his Funds had a conflict of interest in dealing with BizRadio because of the mutually dependent relationship between the two groups of entities;

i.  That more than 33% of the WBIF II's assets and more than 20% of the LFW Fund's assets were being invested in BizRadio; and

j.  That much of investors' funds invested in BizRadio were being used to pay down original purchase money debt for the radio station rather than Plaintiffs' Limited Partnership interests in the WBL Partnerships and Plaintiffs' Promissory Notes from the WBL Partnerships and WBDP and WB Holdings are "securities" within the meaning of the 1934 Act.

83.    Wallace knew at the time his affirmative representations were made that they were false and/or misleading.  He also knew that Plaintiffs would rely on the representations (and failure to disclose negative information) and intended that they rely on those in deciding to purchase the securities.

84.    Plaintiffs have suffered damages in that, in reliance on representations of Wallace, they purchased equity interests or notes from WB, BizRadio, and KCM.  Plaintiffs would not have purchased those equity interests or notes if they had been aware of Wallace's misrepresentations and his failure to disclose key facts about the companies.

**Violation of §20 of the 1934 Act**

85.    Wallace acted as a controlling person of WB within the meaning of §20(a) of the 1934 Act.  By virtue of his position with the WB companies and BizRadio, Wallace had the power and authority to cause the WB Companies to engage in the wrongful conduct complained of herein.  Wallace controlled the WB Companies.  By reason of such conduct, Wallace is liable pursuant to §20(a) of the 1934 Act.

**Texas Securities Act**

86.     Plaintiffs assert this cause of action for violations of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-1 et seq., and in particular Art. 581-33 of the Texas Securities Act.

87.     Art. 581-33(A)(2) of the Texas Securities Act provides that any person who offers to sell securities by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable for to the person selling the security to him.

88.     Plaintiffs' Limited Partnership interests in the WBL Partnerships and Plaintiffs' Promissory Notes from the WBL Partnerships and WBDP and WB Holdings are "securities" within the meaning of the Texas Securities Act.

89.     By reason of the foregoing Wallace has violated, conspired with other parties to violate, and/or aided and abetted violations of Article 581-33 of the Texas Securities Act by making untrue statements of material fact, or omitting to state material facts necessary in order to make the statements which were made not misleading, in light of the circumstances in which the statements were made.

90.     By reason of the misrepresentations and omissions described above, Wallace violated, aided, abetted or controlled another who violated Article 581-33 of the Texas Securities Act and the Wallace has joint and several liability to Plaintiffs as a result.  David Wallace, in convincing Plaintiffs to invest in the WB Companies, BizRadio, and KCM, conspired with Daniel Frishberg, Albert Kaleta, Costa Bajjali, and others.

91.     Each of the above facts, if accurately disclosed to the WBL Partnership Plaintiffs and the WBL Note Plaintiffs, would have been material to Plaintiffs' investment decisions and would have caused those Plaintiffs to refrain from making investments in or loans to WB or the

other companies affiliated with WB.  The WBL Partnership Plaintiffs and WB Note Plaintiffs suffered damage as a result of Wallace's failure to disclose the above material facts. Collectively, Plaintiffs lost $23,736,219.32 as a result of Wallace's violation of Federal and state securities laws.

**Common Law Fraud**

92.      The facts set forth above describe claims for "common law fraud, deceit, or manipulation in connection with the purchase or sale of any security."  As a result, Plaintiffs seek an exception to discharge of their claims under §523(a)(19)(A)(ii) as an independent ground.

93.      Collectively, Plaintiffs lost approximately $24,500,000.00 as a result of Wallace's securities fraud, for which Plaintiffs have claims against the Debtor.  The specific losses by category of investment are set forth in Section II above.

WHEREFORE PREMISES CONSIDERED THE PLAINTIFFS respectfully request that this Court except the debts owing by Debtor to Plaintiffs under sections  523(a)(2)(A), (A)(4) and (a)(19) of the Bankruptcy Code for the reasons set forth herein and for such other and further relief as the Court deems just.

Submitted this 30th day of September, 2015.

Respectfully submitted,

/s/   C. Thomas Schmidt
C. Thomas Schmidt
State Bar No. 00797386
7880 San Felipe, Suite 210
Houston, Texas 77063
(713) 568-4898 Phone
(815) 301-9000 Fax
ATTORNEY IN CHARGE FOR PLAINTIFFS

OF COUNSEL:

SCHMIDT LAW FIRM, PLLC

and

Preston T. Towber
State Bar No. 20152600
Federal ID No. 8217
TOWBER LAW FIRM PLLC
6750 West Loop South, Suite 920
Bellaire, Texas 77401
(832) 485-3555 Phone
(832) 485-3550 Fax
CO-COUNSEL FOR PLAINTIFFS