# EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement (this "**Agreement**"), dated effective as of December 31, 2020 ("**Effective Date**"), is entered into by and between Rodney D. Tow, in his capacity as the Chapter 7 Trustee (the "**Trustee**") for the Chapter 7 Estate of David Gordon Wallace, Jr. (the "**Estate**" or "**Seller**"); Lai Family Investments Inc., a Texas corporation ("**Lai**"); and Dinesh Shah, a Texas resident ("**Shah**"). Lai and Shah are individually referred to herein as "**Buyer**" and collectively as "**Buyers.**"

WHEREAS, the Trustee is the Chapter 7 Trustee for the Estate in the bankruptcy case styled Case No. 15-31594 (Chapter 7), *In re David Gordon Wallace, Jr.* (the "**Bankruptcy Case**"), pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, Seller is the successor in interest to the ownership interest owned or controlled by David Gordon Wallace, Jr. ("**Wallace**") in Sugar Land Entertainment Enterprises, LP, a Texas limited partnership ("**SLEE**"), Rink Operations Management, LLC, a Texas limited liability company ("**ROM**"), and Sugar Land Rink Lenders, LLC, a Texas limited liability company ("**SLRL**") (SLEE, ROM, and SLRL, each individually a "**Skating Rink Entity**" and collectively the "**Skating Rink Entities**");

WHEREAS, Seller is the successor in interest to three hundred twenty thousand (320,000) Class B Units of SLEE (the "**SLEE Interests**"), previously held by the Whitney Leigh Wallace 1996 Sub-S Trust (the "**WLW Trust**") and the Jacquelyn Marie Wallace 1996 Sub-S Trust (the "**JMW Trust**" and together with the WLW Trust, the "**Trusts**") (Seller, the Estate, Wallace, and the Trusts, collectively, the "**Seller Parties**");

WHEREAS, Seller is the successor in interest to 33.33% of the outstanding membership interests of ROM (the "**ROM Interests**"), previously held by the Trusts;

WHEREAS, Seller is the successor in interest to 33.33% of the outstanding membership interests of SLRL (the "**SLRL Interests**"), previously held by the Trusts and/or Wallace (the SLEE Interests, the ROM Interests, and the SLRL Interests, collectively, the "**Equity Interests**"); and

WHEREAS, Seller wishes to sell to Buyers, and Buyers wish to purchase from Seller, the Equity Interests, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01     Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined in <u>Section 1.03</u>), Seller shall sell to Buyers, and Buyers shall purchase from Seller, all of Seller's right, title, and interest in and to the Equity Interests, in each case free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in <u>Section 1.02</u>, as follows: (a) Seller shall sell to Lai, and Lai shall purchase from Seller, all of Seller's right, title, and interest in and to (i) one hundred sixty thousand (160,000) Class B Units of SLEE, (ii) 16.665% of the outstanding membership interests of ROM, and (iii) 16.665% of the outstanding membership interests of SLRL; and (b) Seller shall sell to Shah, and Shah shall purchase from Seller, all of Seller's right, title, and interest in and to (i) one hundred sixty thousand (160,000) Class B Units of SLEE, (ii) 16.665% of the outstanding membership interests of ROM, and (iii) 16.665% of the outstanding

membership interests of SLRL. For purposes of this Agreement, all of Seller's right, title, and interest in and to the Equity Interests shall include without limitation (x) any interests of the Seller Parties in the Skating Rink Entities as assignor of a membership interest or partnership interest; (y) the Seller Parties' (i) capital accounts in the Skating Rink Entities, (ii) rights to share in the profits and losses of the Skating Rink Entities, and (iii) rights to receive distributions from the Skating Rink Entities; and (z) the exercise of all member or limited partner rights (as applicable), including the voting rights attributable to the Equity Interests.

**Section 1.02    Purchase Price.** The aggregate purchase price for the Equity Interests shall be Seventy-Five Thousand Dollars ($75,000.00) (the "**Purchase Price**"). Buyers shall pay the Purchase Price to Seller at the Closing in cash, by check, or by wire transfer of immediately available funds in accordance with the wire transfer instructions delivered by Seller (if any) before the Closing.

**Section 1.03    Closing.** Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place no later than five (5) business days after the last of the closing conditions in ARTICLE IV have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), at such time, date, and place as Seller and Buyers may mutually agree upon (the day on which the Closing takes place being the "**Closing Date**"); provided, however, that for tax purposes the consummation of the transactions contemplated by this Agreement shall be deemed to have occurred at 11:59 p.m. Central Standard Time on the Effective Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyers that the statements contained in this ARTICLE II are true and correct as of the date hereof. For purposes of this ARTICLE II, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual or constructive knowledge of Seller, after due inquiry.

**Section 2.01    Capacity of Seller; Enforceability.** Seller has full capacity to enter into this Agreement and the documents to be delivered hereunder, to carry out his obligations hereunder, and to consummate the transactions contemplated hereby. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution, and delivery by Buyers) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of the Seller Parties, enforceable against the Seller Parties in accordance with their respective terms.

**Section 2.02    No Conflicts; Consents.** The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to the Seller Parties; (b) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration, or modification of, any obligation or loss of any benefit under any contract or other instrument to which any Seller Party is a party; or (c) result in the creation or imposition of any Encumbrance on the Equity Interests. Except for the consents described in ARTICLE IV, no consent, approval, waiver, or authorization is required to be obtained by Seller from any Person in connection with the execution, delivery, and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby. For purposes of this Agreement, the term "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

**Section 2.03     Ownership of Equity Interests.** Seller is the sole legal, beneficial, and equitable owner of the Equity Interests, free and clear of all Encumbrances whatsoever. Other than the governing documents of the Skating Rink Entities, there are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Equity Interests.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyers represent and warrant, to the extent indicated below, to Seller that the statements contained in this ARTICLE III are true and correct as of the date hereof. For purposes of this ARTICLE III, "Buyers' knowledge," "knowledge of Buyers," and any similar phrases shall mean the actual or constructive knowledge of Buyers, after due inquiry.

**Section 3.01     Organization and Authority of Lai.** Lai represents and warrants to Seller that as of the date hereof: (a) Lai is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas; (b) Lai has full corporate power and authority to enter into this Agreement and the documents to be delivered by it hereunder, to carry out its obligations hereunder, and to consummate the transactions contemplated to which it is a party hereby; and (c) the execution, delivery, and performance by Lai of this Agreement and the documents to be delivered by it hereunder and the consummation of the transactions contemplated to which it is a party hereby have been duly authorized by all requisite corporate action on the part of Lai.

**Section 3.02     Capacity of Shah.** Shah represents and warrants to Seller that as of the date hereof, Shah has full capacity to enter into this Agreement and the documents to be delivered hereunder, to carry out his obligations hereunder, and to consummate the transactions contemplated to which he is a party hereby.

**Section 3.03     Enforceability.** Each Buyer represents and warrants to Seller that as of the date hereof, this Agreement and the documents to be delivered hereunder have been duly executed and delivered by such Buyer and, assuming due authorization, execution, and delivery by Seller, this Agreement and the documents to be delivered by such Buyer hereunder constitute legal, valid, and binding obligations of such Buyer enforceable against such Buyer in accordance with their respective terms.

**Section 3.04     No Conflicts; Consents.** Each Buyer represents and warrants to Seller that as of the date hereof, the execution, delivery, and performance by such Buyer of this Agreement and the documents to be delivered by such Buyer hereunder, and the consummation of the transactions contemplated to which such Buyer is a party hereby, do not and will not violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to such Buyer.

## ARTICLE IV
## CLOSING CONDITIONS

**Section 4.01     Closing Conditions of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity ("**Action**") shall have been commenced against Buyer, Seller, or any of the Skating Rink Entities, which would prevent the Closing.

**EX. B - 003**

(b)     No governmental authority shall have enacted, issued, promulgated, enforced or entered any order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(c)     The Bankruptcy Court shall have entered an order approving this Agreement under 11 U.S.C. § 363.

(d)     Each of the partners of SLEE, each of the members of ROM, and each of the members of SLRL shall have waived, and none of them shall have exercised or given any notice of an intent to exercise, any rights of first refusal, rights of first option, preferential purchase rights, or other repurchase rights with respect to the Equity Interests.

(e)     The parties shall have agreed in writing to an allocation of the Purchase Price among the Equity Interests.

**Section 4.02     Conditions to Obligation of Buyers to Close.** The obligations of Buyers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyers' waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed by Seller prior to or on the Closing Date.

(c)     Seller shall have delivered to Buyers evidence satisfactory to Buyers that any security interests and liens attached on the Equity Interests, including those described in Schedule 4.02(c), will have been stripped by Seller, and that at the Closing Buyers will take title to the Equity Interests free and clear of any Encumbrances, such evidence may be an order by the Bankruptcy Court authorizing the Trustee, on behalf of Seller, to sell the Equity Interests free and clear of liens, claims and encumbrances under 11 U.S.C. § 363.

(d)     Seller shall have duly executed and delivered to Buyer:

(i)     Assignment and Assumption Agreements, in the form agreed to by the parties (collectively "**Assignment and Assumption Agreements**"), effectuating the transfer of the Equity Interests as described in Section 1.01.

(ii)    A settlement agreement, in the form agreed to by Seller and the Skating Rink Entities (the "**Settlement Agreement**"), executed by Seller, by which Seller comprehensively releases claims against the Skating Rink Entities and their affiliated persons.

(iii)   A unanimous written consent of the partners of SLEE approving this Agreement and the transactions contemplated hereby, in the form agreed to by the parties (the "**SLEE Consent**"), executed by Seller, on behalf of Seller Parties.

(iv)    A unanimous written consent of the members and managers of ROM approving this Agreement and the transactions contemplated hereby, in the form agreed to by the parties (the "**ROM Consent**"), executed by Seller, on behalf of Seller Parties.

(v)    A unanimous written consent of the members and managers of SLRL approving this Agreement and the transactions contemplated hereby, in the form agreed to by the parties (the "**SLRL Consent**"), executed by Seller, on behalf of Seller Parties.

**Section 4.03    Conditions to Obligation of Seller to Close.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyers contained in this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyers shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed by Buyers prior to or on the Closing Date.

(c)    Buyers shall have delivered the Purchase Price to Seller.

(d)    Buyers shall have duly executed and delivered to Seller:

(i)    The Assignment and Assumption Agreements, executed by the applicable Buyer, effectuating the transfer of the Equity Interests as described in Section 1.01.

(ii)    The Settlement Agreement, executed by the Skating Rink Entities.

(iii)    The SLEE Consent, executed by the partners of SLEE.

(iv)    The ROM Consent, executed by the members of ROM.

(v)    The SLRL Consent, executed by the members of SLRL.

**ARTICLE V**
**TAX MATTERS**

**Section 5.01    Allocation of Company Income and Loss.** Buyers and Seller shall request that the Company allocate all items of Company income, gain, loss, deduction, or credit attributable to the Equity Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

**ARTICLE VI**
**INDEMNIFICATION**

**Section 6.01    Survival of Representations and Covenants.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing up until the closing of the Bankruptcy Case.

**Section 6.02    Indemnification by Seller.** SUBJECT TO THE OTHER TERMS AND CONDITIONS OF THIS ARTICLE VI, SELLER SHALL DEFEND, INDEMNIFY, AND HOLD

**EX. B - 005**

HARMLESS EACH BUYER, ITS AFFILIATES, AND LAI'S SHAREHOLDERS, DIRECTORS, OFFICERS, AND EMPLOYEES (COLLECTIVELY, "**BUYER INDEMNIFIED PARTIES**") FROM AND AGAINST, AND SELLER SHALL PAY TO AND REIMBURSE BUYER INDEMNIFIED PARTIES FOR:

(a)      ALL CLAIMS, JUDGMENTS, DAMAGES, LIABILITIES, SETTLEMENTS, LOSSES, COSTS, AND EXPENSES, INCLUDING REASONABLE ATTORNEYS' FEES AND DISBURSEMENTS (COLLECTIVELY, "**LOSSES**"), ARISING FROM OR RELATING TO ANY INACCURACY IN OR BREACH OF ANY OF THE REPRESENTATIONS OR WARRANTIES OF SELLER CONTAINED IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED IN CONNECTION HEREWITH; OR

(b)      ANY LOSSES ARISING FROM OR RELATING TO ANY BREACH OR NON-FULFILLMENT OF ANY COVENANT, AGREEMENT, OR OBLIGATION TO BE PERFORMED BY SELLER PURSUANT TO THIS AGREEMENT OR ANY DOCUMENT DELIVERED IN CONNECTION HEREWITH;

provided that the maximum potential liability of the Seller for indemnification under this Section 6.02 shall be an amount equal to the Purchase Price; provided, further, that the foregoing limitation on liability does not apply with respect to any intentional fraud committed by the Seller.

For purposes of this Agreement, "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "**control**" (including the terms "**controlled by**" and "**under common control with**") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

Section 6.03      **Indemnification by Buyer.** SUBJECT TO THE OTHER TERMS AND CONDITIONS OF THIS ARTICLE VI, BUYERS SHALL SEVERALLY (BUT NOT JOINTLY) DEFEND, INDEMNIFY, AND HOLD HARMLESS SELLER FROM AND AGAINST, AND BUYERS SHALL SEVERALLY (BUT NOT JOINTLY) PAY TO AND REIMBURSE SELLER FOR:

(a)      ALL LOSSES ARISING FROM OR RELATED TO ANY INACCURACY IN OR BREACH OF ANY OF THE REPRESENTATIONS OR WARRANTIES OF SUCH BUYER CONTAINED IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED IN CONNECTION HEREWITH; OR

(b)      ANY LOSSES ARISING FROM OR RELATING TO ANY BREACH OR NON-FULFILLMENT OF ANY COVENANT, AGREEMENT, OR OBLIGATION TO BE PERFORMED BY SUCH BUYER PURSUANT TO THIS AGREEMENT OR ANY DOCUMENT DELIVERED IN CONNECTION HEREWITH;

provided that the maximum aggregate potential liability of the Buyers for indemnification under this Section 6.03 shall be an amount equal to the Purchase Price; provided, further, that the foregoing limitation on liability does not apply with respect to any intentional fraud committed by Buyers.

Section 6.04      **Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the

Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations hereunder. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent, which consent shall not be unreasonably withheld or delayed.

**Section 6.05   Payments.** Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this <u>ARTICLE VI</u>, the Indemnifying Party shall satisfy its obligations within fifteen (15) business days of such agreement or final, non-appealable adjudication by wire transfer of immediately available funds.

**Section 6.06   Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by applicable law.

**Section 6.07   Effect of Investigation.** Buyers' right to indemnification or other remedy based on the representations, warranties, covenants, and agreements of Seller contained herein will not be affected by any investigation conducted by Buyers, or any knowledge acquired by Buyers at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or agreement.

**Section 6.08   Cumulative Remedies.** The rights and remedies provided in this <u>ARTICLE VI</u> are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**ARTICLE VII**
**TERMINATION**

**Section 7.01   Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyers;

(b)      by Seller or either or both Buyers if: (i) any of the conditions set forth in <u>Section 4.01</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by March 31, 2021 or such later date agreed to by the parties in writing (such date or any such extended date, the "**End Date**"); (ii) there shall be any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any governmental authority that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or (iii) any governmental authority shall have issued an order restraining or enjoining the transactions contemplated by this Agreement.

(c)      by either or both Buyers by written notice to Seller if:

(i)      such Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, or agreement made by Seller pursuant to this

**EX. B - 007**

Agreement that would give rise to the failure of any of the conditions specified in ARTICLE IV and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Buyer;

(ii)     any of the conditions set forth in Section 4.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the End Date, unless such failure shall be due to the failure of Buyers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)     by Seller by written notice to Buyers if:

(i)     Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, or agreement made by Buyers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE IV and such breach, inaccuracy or failure has not been cured by Buyers within ten (10) days of Buyers' receipt of written notice of such breach from Seller;

(ii)     any of the conditions set forth in Section 4.03 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the End Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

**Section 7.02     Effect of Termination.** In the event of the termination of this Agreement in accordance with this ARTICLE VII, this Agreement shall immediately become void and there shall be no liability on the part of any party hereto, except: (a) as set forth in this ARTICLE VII and ARTICLE VIII hereof; and (b) that nothing shall relieve any party hereto from liability for any intentional fraud or willful breach of any provision hereof.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01     Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 8.02     Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 8.03     Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.03):

| If to Seller: | Rodney D. Tow, Chapter 7 Trustee |
| | c/o Rodney Tow, PLLC |
| | 1122 Highborne Cay Court |
| | Texas City, Texas 77590-1403 |
| | Email: rtow@rtowtrustee.com |

with a copy to
(which shall not
constitute notice):

Parkins Lee & Rubio LLP
Attn: Charles Rubio
50 Main Street, Suite 1000
White Plains, NY 10606
Email: crubio@parkinslee.com

If to Lai:

Lai Family Investments, Inc.
Attn: Rocky Lai, President
3217 Montrose Blvd. Ste. 222
Houston, TX 77006-3944
Email: rocky@rockylai.com

If to Shah:

Dinesh Shah
4660 Sweetwater Blvd., Ste. 130
Sugar Land, TX 77479-3169
Email: dinesh@shahcompanies.com

with a copy to
(which shall not
constitute notice):

RMWBH
Attn: Dustin C. Fessler; Justin K. Markel
2800 Post Oak Blvd., 57th Floor
Houston, TX 77056
Email: dfessler@rmwbh.com; jmarkel@rmwbh.com

**Section 8.04    Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.05    Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 8.06    Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the terms and provisions in the body of this Agreement and those in the documents delivered in connection herewith, and the Exhibits, the terms and provisions in the body of this Agreement shall control.

**Section 8.07    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**EX. B - 009**

**Section 8.08   No Third-Party Beneficiaries.** Except as provided in <u>ARTICLE VI</u>, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 8.09   Amendment and Modification.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto.

**Section 8.10   Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 8.11   Governing Law.** This Agreement and all related documents shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

**Section 8.12   Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**Section 8.13   Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 8.14   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective representatives thereunto duly authorized.

**SELLER:**

ESTATE OF DAVID GORDON WALLACE, JR.

By: _____

Rodney D. Tow
Chapter 7 Trustee

**BUYERS:**

LAI FAMILY INVESTMENTS INC.

By: _____

Rocky Lai
President

_____

DINESH SHAH

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective representatives thereunto duly authorized.

**SELLER:**

ESTATE OF DAVID GORDON WALLACE, JR.

By: _____

       Rodney D. Tow
       Chapter 7 Trustee

**BUYERS:**

LAI FAMILY INVESTMENTS INC.

By: _____
    Rocky Lai (Feb 8, 2021 17:57 CST)

       Rocky Lai
       President

_____
Dinesh D Sahh (Feb 8, 2021 17:25 CST)

DINESH SHAH

**SCHEDULE 4.02(c)**

**CERTAIN LIENS TO BE STRIPPED**

The liens and security interests described in the attached documents.

## SECURITY AGREEMENT-PLEDGE
(Whitney Leigh Wallace 1996 Trust)

## ARTICLE I

## GENERAL RECITALS

Identification of Parties

1.01.    This is a security agreement-pledge (the "Agreement") between the **WHITNEY LEIGH WALLACE 1996 TRUST**, whose address is 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478, referred to in this Agreement as "Pledger", and **NEAL JAIN**, an individual whose address is 17 St. Peters' Walk, Sugar Land, Texas  77479, as Agent on behalf of the Lenders, as such terms are defined in that certain Agency Agreement dated as of the effective date hereof among Agent and such Lenders, referred to in this Agreement as "Secured Party".

Debt

1.02.    David Gordon Wallace ("Debtor") has executed and delivered that certain promissory note dated August 22, 2014, in the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) and payable to the Lenders, referred to in this Agreement as the "Promissory Note".  The proceeds of the loan evidenced by the Promissory Note will be invested in a project that will benefit Pledger's financial interests and value of its equity interest in Wallace Bajjali Development Partners, LP, a Texas limited partnership. Accordingly, Pledger has determined that it is in its best interest to provide collateral to secure the Promissory Note.

Nature of Agreement

1.03.    Debtor and Secured Party desire that Pledger grant to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement as collateral for Debtor's performance of the terms and conditions of the Promissory Note and other obligations set forth in this Agreement.

THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, the Pledger and Secured Party agree as follows:

**EX. B - 014**

ARTICLE 2

PLEDGE

Security Interest

2.01.  Pledger creates and grants to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement to secure the payment and performance of the Obligations of Debtor to the Secured Party set forth in Paragraph 2.03 of this Agreement.

Description of Collateral

2.02.

(a)     This Agreement creates a security interest in favor of Secured Party in all of the partnership interests owned by the Pledger in Sugar Land Entertainment Enterprises, LP, a Texas limited partnership, consisting of 160,000 Class B Units of partnership interest (the "Interests").

(b)     All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "Collateral").

Obligations Secured

2.03.  The security interest created by this Agreement secures the following:

(a)     Payment of the indebtedness evidenced by, and performance and discharge of every covenant, condition, and agreement contained in the Promissory Note, and any and all modifications, extensions, or renewals of the Promissory Note (the "Obligations").

(b)     Performance and discharge of every obligation, covenant, and agreement of Pledger contained in this Agreement.

Representations and Warranties of Pledger

2.04.

(a)     Pledger hereby represents and warrants that the Collateral is free and clear of any security interests, liens, restrictions, or encumbrances, other than the security interest created by this Agreement, and that Pledger has full right and power to transfer the Collateral to the Secured

2

Party free and clear of any interests described in this paragraph, and to enter into and carry out this Agreement.

(b)    Pledger has not heretofore signed any financing statement, and no financing statement is now on file in any public office covering the Collateral.  Pledger authorizes Secured Party to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by Secured Party covering the Collateral; and at the request of Secured Party, Pledger will join Secured Party in executing one or more financing statements, pursuant to the Uniform Commercial Code, in form satisfactory to Secured Party.

(c)    Pledger will not sell, transfer or dispose of any portion of the Collateral unless Secured Party consents to such sale, transfer or disposition in writing, in advance.

(d)    Pledger shall, at his own expense, do, make, procure, execute and deliver all acts, things, writings and assurances as Secured Party may at any time reasonably request to protect, assure or enforce its interests, rights and remedies created by, provided in, or emanating from, this Security Agreement.

(e)    Pledger shall keep the Collateral, including any proceeds therefrom, free from unpaid charges, including taxes, and from liens, encumbrances and security interests other than that of Secured Party.

ARTICLE 3

DEFAULT; RIGHTS OF SECURED PARTY

Occurrence of Default

3.01.    As used in this Agreement, "Occurrence of Default" shall be any or all of the following:

(a)    The failure of Pledger punctually and completely to observe, keep, or perform any covenant, agreement, or condition required by this Agreement.

(b)    The failure of Debtor punctually to pay the indebtedness evidenced by the Promissory Note in accordance with its terms.

(c)    Consent by Debtor or Pledger to the appointment of a receiver or liquidator of itself or of any substantial portion of its assets.

(d)    The seizure by a receiver, trustee, or other officer appointed by any court, or by any sheriff, marshal, or other similar governmental officer, under color of legal authority, of any

3

**EX. B - 016**

substantial portion of the assets of Pledger or Debtor and holding possession of the assets for a period of thirty (30) days.

(e)    The assumption of jurisdiction, custody, or control of any of the assets of Pledger or Debtor under the provisions of any presently existing or future law providing for reorganization, dissolution, liquidation, or winding up of corporations or other legal entities, if Pledger has not been restored to custody and control of the assets within thirty (30) days after the date of the assumption.

(f)    If a final judgment for the payment of money shall be rendered against Pledger or Debtor and, within thirty (30) days after the entry of the judgment, it has not been discharged or execution of the judgment has not been stayed pending appeal, or if, within thirty (30) days after the expiration of any stay, the judgment has not been discharged.

<u>Secured Party's Rights and Remedies</u>

3.02.   Secured Party shall have all of the following rights regardless of the existence of any Occurrence of Default.

(a)    This Agreement, Secured Party's rights hereunder, or the indebtedness hereby secured may be assigned from time to time.

(b)    Secured Party may execute, sign, endorse, transfer or deliver in the name of Pledger any documents, necessary to evidence, perfect or realize upon the security interest and obligations created by this Agreement.

(c)    Secured Party shall have no liability with respect to the Collateral, including, without limitation, any obligation for cash calls.

3.03.   Upon an Occurrence of Default, the Secured Party may foreclose the security interest in either of the following ways:

(a)    Provided that the Secured Party gives notice to the Pledger, and the Pledger fails to object within twenty one (21) days of receipt of such notice, the Secured Party may retain, in satisfaction of Pledger's Obligations, all of the Collateral.

(b)    Secured Party may declare all Obligations secured hereby immediately due and payable and shall have the rights and remedies of a Secured Party under the Uniform Commercial Code of Texas, including without limitation thereto, the right to sell, at public or private sale or sales, or otherwise dispose of or utilize the collateral and any part or parts thereof in any manner authorized or permitted under the Uniform Commercial Code after default by a Pledger, at such prices and on such terms as Secured Party may deem reasonable under the circumstances. Secured Party shall have the right to take possession of all or any part of the

4

Collateral and of all books, records, papers and documents in Pledger's possession or control relating to the Collateral which are not already in Secured Party's possession, and for such purpose may enter upon any premises upon which any of the Collateral or any security therefor or any of said books, records, papers and documents are situated and remove the same therefrom. Unless the Collateral threatens to decline in value or is of a type customarily sold on a recognized market Secured Party will send Pledger reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to be made.  The requirement of sending reasonable notice shall be met if such notice is mailed, postage prepaid, to Pledger at the address designated on the first page of this Security Agreement (or at such other address as Pledger shall have designated as its address for receipt of notices hereunder in a writing duly received by Secured Party) at least ten (10) days before the time of the sale or disposition.  Expenses of retaking, holding, selling or the like shall include Secured Party's reasonable attorney's fees and legal expenses, and Pledger agrees to pay such expenses, plus interest thereon at the maximum rate permitted by applicable law from the date such expenses are incurred until repaid.  Pledger shall remain liable for any deficiency.

(c)     No delays or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of any such right or any other right.  A waiver on any one or more occasions shall not be construed as a bar or waiver of any right or remedy on any future occasion.  The remedies of Secured Party hereunder are cumulative, and the right exercise of any one or more of the remedies provided for herein shall not be construed as an election or as a waiver of any of the other remedies of Secured Party provided for herein or existing by law or otherwise.

Additional Agreements

3.04

(a)     The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and future additional security to be considered as cumulative security.  Any of the Collateral may be released from this Agreement without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a first and prior lien, security interest and charge on all of the Collateral not expressly released, until all the Obligations secured hereby have been paid in full.  Any future assignment or attempted assignment of the interest of Pledger in and to any of the Collateral shall not deprive Secured Party of the right to see or otherwise dispose of or utilize all of the Collateral as above provided or necessitate the sale or disposition thereof in parcels or in severalty.

(b)     This Agreement shall not be construed as relieving Pledger from full personal liability on the Obligations secured hereby and for any deficiency thereon.

5

## ARTICLE 4

## VOTING; DIVIDENDS AND DISTRIBUTIONS

### Voting

4.01.   For as long as the Interests are held by Secured Party, and until the date of an Occurrence of Default, if any, the Pledger shall have the right to vote the Interests for all purposes. If requested by the Pledger, the Secured Party shall execute and deliver to the Pledger any proxies and authorizations reasonably required to confirm the voting rights of the Pledger during this period.

### Distributions

4.02.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, all distributions paid in connection with the Interests shall belong to the Pledger.

### Voting Trust

4.03.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, Pledger shall have the right to assign the Collateral to a voting trust.  In the event Pledger makes such an assignment, the Secured Party shall accept certificates of the voting trust in substitution for the Collateral.

## ARTICLE 5

## RELEASE OF COLLATERAL

### Release of Collateral

5.01.    Pledger shall, upon payment in full of the Promissory Note, be entitled to a release of Collateral.

## ARTICLE 6

## MISCELLANEOUS

### No Waiver of Right of Remedies

6.01.   No failure or delay by Secured Party in exercising any right, power, or privilege given by any provision of this Agreement shall operate as a waiver of the provision.

6

Additionally, no single or partial exercise of any right, power, or privilege shall preclude any other or further exercise of that or any other right, power, or privilege.

### Severability

6.02.    Should any one or more of the provisions of this Agreement be determined to be illegal or unenforceable, all other provisions of this Agreement shall be valid, binding, and effective as if the illegal or unenforceable provisions had never been included in this Agreement.

### Notices

6.03.    Any notices of other communications required or permitted by this Agreement shall be delivered personally or sent by registered or certified mail, postage prepaid to 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478 for Pledger and 17 St. Peters' Walk, Sugar Land, Texas  77479wh for Secured Party, or at any other address furnished in writing by either party to the other, and shall be deemed to have been given as of the date the notice is personally delivered or deposited in the United States mail.

### Assignment by Secured Party

6.04.    This Agreement and the security interest created by this Agreement shall be assignable by the Secured Party, and shall inure to the benefit of Secured Party's heirs, executors, or administrators, and shall be binding upon the Pledger and his or her heirs, executors, administrators, legal representatives, successors, and assigns.

### Choice of Law

6.05.    It is the intention of the parties that the laws of Texas should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

### Paragraph Headings

6.06.    Paragraph and other headings contained in this Agreement are for purposes of reference and convenience only and shall not affect in any way the meaning of this Agreement or its interpretation.

### Integrated Agreement

6.07.    This Agreement constitutes the entire Agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this Agreement.

7

IN WITNESS WHEREOF, this Agreement has been executed effective as of August 22 2014.

PLEDGER:

**WHITNEY LEIGH WALLACE 1996 TRUST**

David G. Wallace, Trustee

SECURED PARTY:

NEAL JAIN, individually and as Agent for the Lenders

ACKNOWLEDGED AND AGREED:

David Gordon Wallace, Debtor

8

# SECURITY AGREEMENT-PLEDGE
### (Whitney Leigh Wallace 1996 Sub-S Trust)

## ARTICLE I

## GENERAL RECITALS

### Identification of Parties

1.01.    This is a security agreement-pledge (the "Agreement") between the **WHITNEY LEIGH WALLACE 1996 SUB-S TRUST**, whose address is 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478, referred to in this Agreement as "Pledger", and **NEAL JAIN**, an individual whose address is 17 St. Peters' Walk, Sugar Land, Texas 77479, as Agent on behalf of the Lenders, as such terms are defined in that certain Agency Agreement dated as of the effective date hereof among Agent and such Lenders, referred to in this Agreement as "Secured Party".

### Debt

1.02.    David Gordon Wallace ("Debtor") has executed and delivered that certain promissory note dated August 22, 2014, in the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) and payable to the Lenders, referred to in this Agreement as the "Promissory Note".   The proceeds of the loan evidenced by the Promissory Note will be invested in a project that will benefit Pledger's financial interests and value of its equity interest in Wallace Bajjali Development Partners, LP, a Texas limited partnership. Accordingly, Pledger has determined that it is in its best interest to provide collateral to secure the Promissory Note.

### Nature of Agreement

1.03.    Debtor and Secured Party desire that Pledger grant to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement as collateral for Debtor's performance of the terms and conditions of the Promissory Note and other obligations set forth in this Agreement.

THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, the Pledger and Secured Party agree as follows:

## ARTICLE 2

## PLEDGE

### Security Interest

2.01.  Pledger creates and grants to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement to secure the payment and performance of the Obligations of Debtor to the Secured Party set forth in Paragraph 2.03 of this Agreement.

### Description of Collateral

2.02.

(a)    This Agreement creates a security interest in favor of Secured Party in all of the membership interests owned by the Pledger in the limited liability companies set forth on Exhibit A attached hereto (the "Interests").

(b)    All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "Collateral").

### Obligations Secured

2.03.  The security interest created by this Agreement secures the following:

(a)    Payment of the indebtedness evidenced by, and performance and discharge of every covenant, condition, and agreement contained in the Promissory Note, and any and all modifications, extensions, or renewals of the Promissory Note (the "Obligations").

(b)    Performance and discharge of every obligation, covenant, and agreement of Pledger contained in this Agreement.

### Representations and Warranties of Pledger

2.04.

(a)    Pledger hereby represents and warrants that the Collateral is free and clear of any security interests, liens, restrictions, or encumbrances, other than the security interest created by this Agreement, and that Pledger has full right and power to transfer the Collateral to the Secured

2

Party free and clear of any interests described in this paragraph, and to enter into and carry out this Agreement.

(b)    Pledger has not heretofore signed any financing statement, and no financing statement is now on file in any public office covering the Collateral.  Pledger authorizes Secured Party to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by Secured Party covering the Collateral; and at the request of Secured Party, Pledger will join Secured Party in executing one or more financing statements, pursuant to the Uniform Commercial Code, in form satisfactory to Secured Party.

(c)    Pledger will not sell, transfer or dispose of any portion of the Collateral unless Secured Party consents to such sale, transfer or disposition in writing, in advance.

(d)    Pledger shall, at his own expense, do, make, procure, execute and deliver all acts, things, writings and assurances as Secured Party may at any time reasonably request to protect, assure or enforce its interests, rights and remedies created by, provided in, or emanating from, this Security Agreement.

(e)    Pledger shall keep the Collateral, including any proceeds therefrom, free from unpaid charges, including taxes, and from liens, encumbrances and security interests other than that of Secured Party.

ARTICLE 3

DEFAULT; RIGHTS OF SECURED PARTY

Occurrence of Default

3.01.    As used in this Agreement, "Occurrence of Default" shall be any or all of the following:

(a)    The failure of Pledger punctually and completely to observe, keep, or perform any covenant, agreement, or condition required by this Agreement.

(b)    The failure of Debtor punctually to pay the indebtedness evidenced by the Promissory Note in accordance with its terms.

(c)    Consent by Debtor or Pledger to the appointment of a receiver or liquidator of itself or of any substantial portion of its assets.

(d)    The seizure by a receiver, trustee, or other officer appointed by any court, or by any sheriff, marshal, or other similar governmental officer, under color of legal authority, of any

3

substantial portion of the assets of Pledger or Debtor and holding possession of the assets for a period of thirty (30) days.

(e)     The assumption of jurisdiction, custody, or control of any of the assets of Pledger or Debtor under the provisions of any presently existing or future law providing for reorganization, dissolution, liquidation, or winding up of corporations or other legal entities, if Pledger has not been restored to custody and control of the assets within thirty (30) days after the date of the assumption.

(f)     If a final judgment for the payment of money shall be rendered against Pledger or Debtor and, within thirty (30) days after the entry of the judgment, it has not been discharged or execution of the judgment has not been stayed pending appeal, or if, within thirty (30) days after the expiration of any stay, the judgment has not been discharged.

<u>Secured Party's Rights and Remedies</u>

3.02.   Secured Party shall have all of the following rights regardless of the existence of any Occurrence of Default.

(a)     This Agreement, Secured Party's rights hereunder, or the indebtedness hereby secured may be assigned from time to time.

(b)     Secured Party may execute, sign, endorse, transfer or deliver in the name of Pledger any documents, necessary to evidence, perfect or realize upon the security interest and obligations created by this Agreement.

(c)     Secured Party shall have no liability with respect to the Collateral, including, without limitation, any obligation for cash calls.

3.03.   Upon an Occurrence of Default, the Secured Party may foreclose the security interest in either of the following ways:

(a)     Provided that the Secured Party gives notice to the Pledger, and the Pledger fails to object within twenty one (21) days of receipt of such notice, the Secured Party may retain, in satisfaction of Pledger's Obligations, all of the Collateral.

(b)     Secured Party may declare all Obligations secured hereby immediately due and payable and shall have the rights and remedies of a Secured Party under the Uniform Commercial Code of Texas, including without limitation thereto, the right to sell, at public or private sale or sales, or otherwise dispose of or utilize the collateral and any part or parts thereof in any manner authorized or permitted under the Uniform Commercial Code after default by a Pledger, at such prices and on such terms as Secured Party may deem reasonable under the circumstances. Secured Party shall have the right to take possession of all or any part of the

4

Collateral and of all books, records, papers and documents in Pledger's possession or control relating to the Collateral which are not already in Secured Party's possession, and for such purpose may enter upon any premises upon which any of the Collateral or any security therefor or any of said books, records, papers and documents are situated and remove the same therefrom. Unless the Collateral threatens to decline in value or is of a type customarily sold on a recognized market Secured Party will send Pledger reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to be made. The requirement of sending reasonable notice shall be met if such notice is mailed, postage prepaid, to Pledger at the address designated on the first page of this Security Agreement (or at such other address as Pledger shall have designated as its address for receipt of notices hereunder in a writing duly received by Secured Party) at least ten (10) days before the time of the sale or disposition. Expenses of retaking, holding, selling or the like shall include Secured Party's reasonable attorney's fees and legal expenses, and Pledger agrees to pay such expenses, plus interest thereon at the maximum rate permitted by applicable law from the date such expenses are incurred until repaid. Pledger shall remain liable for any deficiency.

(c)     No delays or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of any such right or any other right. A waiver on any one or more occasions shall not be construed as a bar or waiver of any right or remedy on any future occasion. The remedies of Secured Party hereunder are cumulative, and the right exercise of any one or more of the remedies provided for herein shall not be construed as an election or as a waiver of any of the other remedies of Secured Party provided for herein or existing by law or otherwise.

<u>Additional Agreements</u>

3.04

(a)     The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and future additional security to be considered as cumulative security. Any of the Collateral may be released from this Agreement without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a first and prior lien, security interest and charge on all of the Collateral not expressly released, until all the Obligations secured hereby have been paid in full. Any future assignment or attempted assignment of the interest of Pledger in and to any of the Collateral shall not deprive Secured Party of the right to see or otherwise dispose of or utilize all of the Collateral as above provided or necessitate the sale or disposition thereof in parcels or in severalty.

(b)     This Agreement shall not be construed as relieving Pledger from full personal liability on the Obligations secured hereby and for any deficiency thereon.

5

**EX. B - 026**

# ARTICLE 4

## VOTING; DIVIDENDS AND DISTRIBUTIONS

### Voting

4.01.   For as long as the Interests are held by Secured Party, and until the date of an Occurrence of Default, if any, the Pledger shall have the right to vote the Interests for all purposes. If requested by the Pledger, the Secured Party shall execute and deliver to the Pledger any proxies and authorizations reasonably required to confirm the voting rights of the Pledger during this period.

### Distributions

4.02.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, all distributions paid in connection with the Interests shall belong to the Pledger.

### Voting Trust

4.03.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, Pledger shall have the right to assign the Collateral to a voting trust.  In the event Pledger makes such an assignment, the Secured Party shall accept certificates of the voting trust in substitution for the Collateral.

# ARTICLE 5

## RELEASE OF COLLATERAL

### Release of Collateral

5.01.   Pledger shall, upon payment in full of the Promissory Note, be entitled to a release of Collateral.

# ARTICLE 6

## MISCELLANEOUS

### No Waiver of Right of Remedies

6.01.   No failure or delay by Secured Party in exercising any right, power, or privilege given by any provision of this Agreement shall operate as a waiver of the provision.

6

Additionally, no single or partial exercise of any right, power, or privilege shall preclude any other or further exercise of that or any other right, power, or privilege.

## Severability

6.02.    Should any one or more of the provisions of this Agreement be determined to be illegal or unenforceable, all other provisions of this Agreement shall be valid, binding, and effective as if the illegal or unenforceable provisions had never been included in this Agreement.

## Notices

6.03.    Any notices of other communications required or permitted by this Agreement shall be delivered personally or sent by registered or certified mail, postage prepaid to 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478 for Pledger and 17 St. Peters' Walk, Sugar Land, Texas  77479 for Secured Party, or at any other address furnished in writing by either party to the other, and shall be deemed to have been given as of the date the notice is personally delivered or deposited in the United States mail.

## Assignment by Secured Party

6.04.    This Agreement and the security interest created by this Agreement shall be assignable by the Secured Party, and shall inure to the benefit of Secured Party's heirs, executors, or administrators, and shall be binding upon the Pledger and his or her heirs, executors, administrators, legal representatives, successors, and assigns.

## Choice of Law

6.05.    It is the intention of the parties that the laws of Texas should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

## Paragraph Headings

6.06.    Paragraph and other headings contained in this Agreement are for purposes of reference and convenience only and shall not affect in any way the meaning of this Agreement or its interpretation.

## Integrated Agreement

6.07.    This Agreement constitutes the entire Agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this Agreement.

7

IN WITNESS WHEREOF, this Agreement has been executed effective as of August 22, 2014.

PLEDGER:

**WHITNEY LEIGH WALLACE 1996 SUB-S TRUST**

David G. Wallace, Trustee

SECURED PARTY:

NEAL JAIN, individually and as Agent for the Lenders

ACKNOWLEDGED AND AGREED:

David Gordon Wallace, Debtor

8

**EX. B - 029**

## EXHIBIT A

| Company | % Membership Interest |
|---|---|
| Rink Operations Management, LLC | 16.665% |

# SECURITY AGREEMENT-PLEDGE
(Jacquelyn Marie Wallace 1996 Trust)

## ARTICLE I

## GENERAL RECITALS

### Identification of Parties

1.01.　　This is a security agreement-pledge (the "Agreement") between the **JACQUELYN MARIE WALLACE 1996 TRUST**, whose address is 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478, referred to in this Agreement as "Pledger", and **NEAL JAIN**, an individual whose address is 17 St. Peters' Walk, Sugar Land, Texas 77479, as Agent on behalf of the Lenders, as such terms are defined in that certain Agency Agreement dated as of the effective date hereof among Agent and such Lenders, referred to in this Agreement as "Secured Party".

### Debt

1.02.　　David Gordon Wallace ("Debtor") has executed and delivered that certain promissory note dated August 22, 2014, in the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) and payable to the Lenders, referred to in this Agreement as the "Promissory Note". The proceeds of the loan evidenced by the Promissory Note will be invested in a project that will benefit Pledger's financial interests and value of its equity interest in Wallace Bajjali Development Partners, LP, a Texas limited partnership. Accordingly, Pledger has determined that it is in its best interest to provide collateral to secure the Promissory Note.

### Nature of Agreement

1.03.　　Debtor and Secured Party desire that Pledger grant to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement as collateral for Debtor's performance of the terms and conditions of the Promissory Note and other obligations set forth in this Agreement.

THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, the Pledger and Secured Party agree as follows:

ARTICLE 2

PLEDGE

Security Interest

2.01.  Pledger creates and grants to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement to secure the payment and performance of the Obligations of Debtor to the Secured Party set forth in Paragraph 2.03 of this Agreement.

Description of Collateral

2.02.

(a)     This Agreement creates a security interest in favor of Secured Party in all of the partnership interests owned by the Pledger in Sugar Land Entertainment Enterprises, LP, a Texas limited partnership, consisting of 160,000 Class B Units of partnership interest (the "Interests").

(b)     All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "Collateral").

Obligations Secured

2.03.  The security interest created by this Agreement secures the following:

(a)     Payment of the indebtedness evidenced by, and performance and discharge of every covenant, condition, and agreement contained in the Promissory Note, and any and all modifications, extensions, or renewals of the Promissory Note (the "Obligations").

(b)     Performance and discharge of every obligation, covenant, and agreement of Pledger contained in this Agreement.

Representations and Warranties of Pledger

2.04.

(a)     Pledger hereby represents and warrants that the Collateral is free and clear of any security interests, liens, restrictions, or encumbrances, other than the security interest created by this Agreement, and that Pledger has full right and power to transfer the Collateral to the Secured

2

Party free and clear of any interests described in this paragraph, and to enter into and carry out this Agreement.

(b)     Pledger has not heretofore signed any financing statement, and no financing statement is now on file in any public office covering the Collateral.  Pledger authorizes Secured Party to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by Secured Party covering the Collateral; and at the request of Secured Party, Pledger will join Secured Party in executing one or more financing statements, pursuant to the Uniform Commercial Code, in form satisfactory to Secured Party.

(c)     Pledger will not sell, transfer or dispose of any portion of the Collateral unless Secured Party consents to such sale, transfer or disposition in writing, in advance.

(d)     Pledger shall, at his own expense, do, make, procure, execute and deliver all acts, things, writings and assurances as Secured Party may at any time reasonably request to protect, assure or enforce its interests, rights and remedies created by, provided in, or emanating from, this Security Agreement.

(e)     Pledger shall keep the Collateral, including any proceeds therefrom, free from unpaid charges, including taxes, and from liens, encumbrances and security interests other than that of Secured Party.

ARTICLE 3

DEFAULT; RIGHTS OF SECURED PARTY

<u>Occurrence of Default</u>

3.01.     As used in this Agreement, "<u>Occurrence of Default</u>" shall be any or all of the following:

(a)     The failure of Pledger punctually and completely to observe, keep, or perform any covenant, agreement, or condition required by this Agreement.

(b)     The failure of Debtor punctually to pay the indebtedness evidenced by the Promissory Note in accordance with its terms.

(c)     Consent by Debtor or Pledger to the appointment of a receiver or liquidator of itself or of any substantial portion of its assets.

(d)     The seizure by a receiver, trustee, or other officer appointed by any court, or by any sheriff, marshal, or other similar governmental officer, under color of legal authority, of any

3

**EX. B - 033**

substantial portion of the assets of Pledger or Debtor and holding possession of the assets for a period of thirty (30) days.

(e)    The assumption of jurisdiction, custody, or control of any of the assets of Pledger or Debtor under the provisions of any presently existing or future law providing for reorganization, dissolution, liquidation, or winding up of corporations or other legal entities, if Pledger has not been restored to custody and control of the assets within thirty (30) days after the date of the assumption.

(f)    If a final judgment for the payment of money shall be rendered against Pledger or Debtor and, within thirty (30) days after the entry of the judgment, it has not been discharged or execution of the judgment has not been stayed pending appeal, or if, within thirty (30) days after the expiration of any stay, the judgment has not been discharged.

<u>Secured Party's Rights and Remedies</u>

3.02.   Secured Party shall have all of the following rights regardless of the existence of any Occurrence of Default.

(a)    This Agreement, Secured Party's rights hereunder, or the indebtedness hereby secured may be assigned from time to time.

(b)    Secured Party may execute, sign, endorse, transfer or deliver in the name of Pledger any documents, necessary to evidence, perfect or realize upon the security interest and obligations created by this Agreement.

(c)    Secured Party shall have no liability with respect to the Collateral, including, without limitation, any obligation for cash calls.

3.03.   Upon an Occurrence of Default, the Secured Party may foreclose the security interest in either of the following ways:

(a)    Provided that the Secured Party gives notice to the Pledger, and the Pledger fails to object within twenty one (21) days of receipt of such notice, the Secured Party may retain, in satisfaction of Pledger's Obligations, all of the Collateral.

(b)    Secured Party may declare all Obligations secured hereby immediately due and payable and shall have the rights and remedies of a Secured Party under the Uniform Commercial Code of Texas, including without limitation thereto, the right to sell, at public or private sale or sales, or otherwise dispose of or utilize the collateral and any part or parts thereof in any manner authorized or permitted under the Uniform Commercial Code after default by a Pledger, at such prices and on such terms as Secured Party may deem reasonable under the circumstances. Secured Party shall have the right to take possession of all or any part of the

4

Collateral and of all books, records, papers and documents in Pledger's possession or control relating to the Collateral which are not already in Secured Party's possession, and for such purpose may enter upon any premises upon which any of the Collateral or any security therefor or any of said books, records, papers and documents are situated and remove the same therefrom. Unless the Collateral threatens to decline in value or is of a type customarily sold on a recognized market Secured Party will send Pledger reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to be made.  The requirement of sending reasonable notice shall be met if such notice is mailed, postage prepaid, to Pledger at the address designated on the first page of this Security Agreement (or at such other address as Pledger shall have designated as its address for receipt of notices hereunder in a writing duly received by Secured Party) at least ten (10) days before the time of the sale or disposition.  Expenses of retaking, holding, selling or the like shall include Secured Party's reasonable attorney's fees and legal expenses, and Pledger agrees to pay such expenses, plus interest thereon at the maximum rate permitted by applicable law from the date such expenses are incurred until repaid.  Pledger shall remain liable for any deficiency.

(c)     No delays or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of any such right or any other right.  A waiver on any one or more occasions shall not be construed as a bar or waiver of any right or remedy on any future occasion.  The remedies of Secured Party hereunder are cumulative, and the right exercise of any one or more of the remedies provided for herein shall not be construed as an election or as a waiver of any of the other remedies of Secured Party provided for herein or existing by law or otherwise.

<u>Additional Agreements</u>

3.04

(a)     The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and future additional security to be considered as cumulative security.  Any of the Collateral may be released from this Agreement without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a first and prior lien, security interest and charge on all of the Collateral not expressly released, until all the Obligations secured hereby have been paid in full.  Any future assignment or attempted assignment of the interest of Pledger in and to any of the Collateral shall not deprive Secured Party of the right to see or otherwise dispose of or utilize all of the Collateral as above provided or necessitate the sale or disposition thereof in parcels or in severalty.

(b)     This Agreement shall not be construed as relieving Pledger from full personal liability on the Obligations secured hereby and for any deficiency thereon.

5

## ARTICLE 4

## VOTING; DIVIDENDS AND DISTRIBUTIONS

### Voting

4.01.   For as long as the Interests are held by Secured Party, and until the date of an Occurrence of Default, if any, the Pledger shall have the right to vote the Interests for all purposes. If requested by the Pledger, the Secured Party shall execute and deliver to the Pledger any proxies and authorizations reasonably required to confirm the voting rights of the Pledger during this period.

### Distributions

4.02.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, all distributions paid in connection with the Interests shall belong to the Pledger.

### Voting Trust

4.03.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, Pledger shall have the right to assign the Collateral to a voting trust.  In the event Pledger makes such an assignment, the Secured Party shall accept certificates of the voting trust in substitution for the Collateral.

## ARTICLE 5

## RELEASE OF COLLATERAL

### Release of Collateral

5.01.   Pledger shall, upon payment in full of the Promissory Note, be entitled to a release of Collateral.

## ARTICLE 6

## MISCELLANEOUS

### No Waiver of Right of Remedies

6.01.   No failure or delay by Secured Party in exercising any right, power, or privilege given by any provision of this Agreement shall operate as a waiver of the provision.

6

Additionally, no single or partial exercise of any right, power, or privilege shall preclude any other or further exercise of that or any other right, power, or privilege.

## Severability

6.02.    Should any one or more of the provisions of this Agreement be determined to be illegal or unenforceable, all other provisions of this Agreement shall be valid, binding, and effective as if the illegal or unenforceable provisions had never been included in this Agreement.

## Notices

6.03.    Any notices of other communications required or permitted by this Agreement shall be delivered personally or sent by registered or certified mail, postage prepaid to 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478 for Pledger and 17 St. Peters' Walk, Sugar Land, Texas  77479 for Secured Party, or at any other address furnished in writing by either party to the other, and shall be deemed to have been given as of the date the notice is personally delivered or deposited in the United States mail.

## Assignment by Secured Party

6.04.    This Agreement and the security interest created by this Agreement shall be assignable by the Secured Party, and shall inure to the benefit of Secured Party's heirs, executors, or administrators, and shall be binding upon the Pledger and his or her heirs, executors, administrators, legal representatives, successors, and assigns.

## Choice of Law

6.05.    It is the intention of the parties that the laws of Texas should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

## Paragraph Headings

6.06.    Paragraph and other headings contained in this Agreement are for purposes of reference and convenience only and shall not affect in any way the meaning of this Agreement or its interpretation.

## Integrated Agreement

6.07.    This Agreement constitutes the entire Agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this Agreement.

7

IN WITNESS WHEREOF, this Agreement has been executed effective as of August 21, 2014.

PLEDGER:

**JACQUELYN MARIE WALLACE 1996**
**TRUST**

David G. Wallace, Trustee

SECURED PARTY:

NEAL JAIN, individually and as Agent for the
Lenders

ACKNOWLEDGED AND AGREED:

David Gordon Wallace, Debtor

8

**EX. B - 038**

# SECURITY AGREEMENT-PLEDGE

(Jacquelyn Marie Wallace 1996 Sub-S Trust)

## ARTICLE I

## GENERAL RECITALS

### Identification of Parties

1.01.    This is a security agreement-pledge (the "Agreement") between the **JACQUELYN MARIE WALLACE 1996 SUB-S TRUST**, whose address is 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478, referred to in this Agreement as "Pledger", and **NEAL JAIN**, an individual whose address is 17 St. Peters' Walk, Sugar Land, Texas 77479, as Agent on behalf of the Lenders, as such terms are defined in that certain Agency Agreement dated as of the effective date hereof among Agent and such Lenders, referred to in this Agreement as "Secured Party".

### Debt

1.02.    David Gordon Wallace ("Debtor") has executed and delivered that certain promissory note dated August 22, 2014, in the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) and payable to the Lenders, referred to in this Agreement as the "Promissory Note". The proceeds of the loan evidenced by the Promissory Note will be invested in a project that will benefit Pledger's financial interests and value of its equity interest in Wallace Bajjali Development Partners, LP, a Texas limited partnership. Accordingly, Pledger has determined that it is in its best interest to provide collateral to secure the Promissory Note.

### Nature of Agreement

1.03.    Debtor and Secured Party desire that Pledger grant to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement as collateral for Debtor's performance of the terms and conditions of the Promissory Note and other obligations set forth in this Agreement.

THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, the Pledger and Secured Party agree as follows:

ARTICLE 2

PLEDGE

<u>Security Interest</u>

2.01.  Pledger creates and grants to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement to secure the payment and performance of the Obligations of Debtor to the Secured Party set forth in Paragraph 2.03 of this Agreement.

<u>Description of Collateral</u>

2.02.

(a)     This Agreement creates a security interest in favor of Secured Party in all of the membership interests owned by the Pledger in the limited liability companies set forth on Exhibit A attached hereto (the "<u>Interests</u>").

(b)     All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "<u>Collateral</u>").

<u>Obligations Secured</u>

2.03.  The security interest created by this Agreement secures the following:

(a)     Payment of the indebtedness evidenced by, and performance and discharge of every covenant, condition, and agreement contained in the Promissory Note, and any and all modifications, extensions, or renewals of the Promissory Note (the "<u>Obligations</u>").

(b)     Performance and discharge of every obligation, covenant, and agreement of Pledger contained in this Agreement.

<u>Representations and Warranties of Pledger</u>

2.04.

(a)     Pledger hereby represents and warrants that the Collateral is free and clear of any security interests, liens, restrictions, or encumbrances, other than the security interest created by this Agreement, and that Pledger has full right and power to transfer the Collateral to the Secured

2

Party free and clear of any interests described in this paragraph, and to enter into and carry out this Agreement.

(b)    Pledger has not heretofore signed any financing statement, and no financing statement is now on file in any public office covering the Collateral.  Pledger authorizes Secured Party to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by Secured Party covering the Collateral; and at the request of Secured Party, Pledger will join Secured Party in executing one or more financing statements, pursuant to the Uniform Commercial Code, in form satisfactory to Secured Party.

(c)    Pledger will not sell, transfer or dispose of any portion of the Collateral unless Secured Party consents to such sale, transfer or disposition in writing, in advance.

(d)    Pledger shall, at his own expense, do, make, procure, execute and deliver all acts, things, writings and assurances as Secured Party may at any time reasonably request to protect, assure or enforce its interests, rights and remedies created by, provided in, or emanating from, this Security Agreement.

(e)    Pledger shall keep the Collateral, including any proceeds therefrom, free from unpaid charges, including taxes, and from liens, encumbrances and security interests other than that of Secured Party.

ARTICLE 3

DEFAULT; RIGHTS OF SECURED PARTY

<u>Occurrence of Default</u>

3.01.    As used in this Agreement, "<u>Occurrence of Default</u>" shall be any or all of the following:

(a)    The failure of Pledger punctually and completely to observe, keep, or perform any covenant, agreement, or condition required by this Agreement.

(b)    The failure of Debtor punctually to pay the indebtedness evidenced by the Promissory Note in accordance with its terms.

(c)    Consent by Debtor or Pledger to the appointment of a receiver or liquidator of itself or of any substantial portion of its assets.

(d)    The seizure by a receiver, trustee, or other officer appointed by any court, or by any sheriff, marshal, or other similar governmental officer, under color of legal authority, of any

3

**EX. B - 041**

substantial portion of the assets of Pledger or Debtor and holding possession of the assets for a period of thirty (30) days.

(e)     The assumption of jurisdiction, custody, or control of any of the assets of Pledger or Debtor under the provisions of any presently existing or future law providing for reorganization, dissolution, liquidation, or winding up of corporations or other legal entities, if Pledger has not been restored to custody and control of the assets within thirty (30) days after the date of the assumption.

(f)     If a final judgment for the payment of money shall be rendered against Pledger or Debtor and, within thirty (30) days after the entry of the judgment, it has not been discharged or execution of the judgment has not been stayed pending appeal, or if, within thirty (30) days after the expiration of any stay, the judgment has not been discharged.

<u>Secured Party's Rights and Remedies</u>

3.02.   Secured Party shall have all of the following rights regardless of the existence of any Occurrence of Default.

(a)     This Agreement, Secured Party's rights hereunder, or the indebtedness hereby secured may be assigned from time to time.

(b)     Secured Party may execute, sign, endorse, transfer or deliver in the name of Pledger any documents, necessary to evidence, perfect or realize upon the security interest and obligations created by this Agreement.

(c)     Secured Party shall have no liability with respect to the Collateral, including, without limitation, any obligation for cash calls.

3.03.   Upon an Occurrence of Default, the Secured Party may foreclose the security interest in either of the following ways:

(a)     Provided that the Secured Party gives notice to the Pledger, and the Pledger fails to object within twenty one (21) days of receipt of such notice, the Secured Party may retain, in satisfaction of Pledger's Obligations, all of the Collateral.

(b)     Secured Party may declare all Obligations secured hereby immediately due and payable and shall have the rights and remedies of a Secured Party under the Uniform Commercial Code of Texas, including without limitation thereto, the right to sell, at public or private sale or sales, or otherwise dispose of or utilize the collateral and any part or parts thereof in any manner authorized or permitted under the Uniform Commercial Code after default by a Pledger, at such prices and on such terms as Secured Party may deem reasonable under the circumstances. Secured Party shall have the right to take possession of all or any part of the

4

Collateral and of all books, records, papers and documents in Pledger's possession or control relating to the Collateral which are not already in Secured Party's possession, and for such purpose may enter upon any premises upon which any of the Collateral or any security therefor or any of said books, records, papers and documents are situated and remove the same therefrom. Unless the Collateral threatens to decline in value or is of a type customarily sold on a recognized market Secured Party will send Pledger reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to be made. The requirement of sending reasonable notice shall be met if such notice is mailed, postage prepaid, to Pledger at the address designated on the first page of this Security Agreement (or at such other address as Pledger shall have designated as its address for receipt of notices hereunder in a writing duly received by Secured Party) at least ten (10) days before the time of the sale or disposition. Expenses of retaking, holding, selling or the like shall include Secured Party's reasonable attorney's fees and legal expenses, and Pledger agrees to pay such expenses, plus interest thereon at the maximum rate permitted by applicable law from the date such expenses are incurred until repaid. Pledger shall remain liable for any deficiency.

(c)     No delays or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of any such right or any other right. A waiver on any one or more occasions shall not be construed as a bar or waiver of any right or remedy on any future occasion. The remedies of Secured Party hereunder are cumulative, and the right exercise of any one or more of the remedies provided for herein shall not be construed as an election or as a waiver of any of the other remedies of Secured Party provided for herein or existing by law or otherwise.

<u>Additional Agreements</u>

3.04

(a)     The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and future additional security to be considered as cumulative security. Any of the Collateral may be released from this Agreement without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a first and prior lien, security interest and charge on all of the Collateral not expressly released, until all the Obligations secured hereby have been paid in full. Any future assignment or attempted assignment of the interest of Pledger in and to any of the Collateral shall not deprive Secured Party of the right to see or otherwise dispose of or utilize all of the Collateral as above provided or necessitate the sale or disposition thereof in parcels or in severalty.

(b)     This Agreement shall not be construed as relieving Pledger from full personal liability on the Obligations secured hereby and for any deficiency thereon.

5

## ARTICLE 4

### VOTING; DIVIDENDS AND DISTRIBUTIONS

#### Voting

4.01.    For as long as the Interests are held by Secured Party, and until the date of an Occurrence of Default, if any, the Pledger shall have the right to vote the Interests for all purposes. If requested by the Pledger, the Secured Party shall execute and deliver to the Pledger any proxies and authorizations reasonably required to confirm the voting rights of the Pledger during this period.

#### Distributions

4.02.    For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, all distributions paid in connection with the Interests shall belong to the Pledger.

#### Voting Trust

4.03.    For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, Pledger shall have the right to assign the Collateral to a voting trust.  In the event Pledger makes such an assignment, the Secured Party shall accept certificates of the voting trust in substitution for the Collateral.

## ARTICLE 5

### RELEASE OF COLLATERAL

#### Release of Collateral

5.01.    Pledger shall, upon payment in full of the Promissory Note, be entitled to a release of Collateral.

## ARTICLE 6

### MISCELLANEOUS

#### No Waiver of Right of Remedies

6.01.    No failure or delay by Secured Party in exercising any right, power, or privilege given by any provision of this Agreement shall operate as a waiver of the provision.

6

Additionally, no single or partial exercise of any right, power, or privilege shall preclude any other or further exercise of that or any other right, power, or privilege.

## Severability

6.02.   Should any one or more of the provisions of this Agreement be determined to be illegal or unenforceable, all other provisions of this Agreement shall be valid, binding, and effective as if the illegal or unenforceable provisions had never been included in this Agreement.

## Notices

6.03.   Any notices of other communications required or permitted by this Agreement shall be delivered personally or sent by registered or certified mail, postage prepaid to 13131 Dairy Ashford, Suite 175 Sugar Land, Texas 77478 for Pledger and 17 St. Peters' Walk, Sugar Land, Texas  77479 for Secured Party, or at any other address furnished in writing by either party to the other, and shall be deemed to have been given as of the date the notice is personally delivered or deposited in the United States mail.

## Assignment by Secured Party

6.04.   This Agreement and the security interest created by this Agreement shall be assignable by the Secured Party, and shall inure to the benefit of Secured Party's heirs, executors, or administrators, and shall be binding upon the Pledger and his or her heirs, executors, administrators, legal representatives, successors, and assigns.

## Choice of Law

6.05.   It is the intention of the parties that the laws of Texas should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

## Paragraph Headings

6.06.   Paragraph and other headings contained in this Agreement are for purposes of reference and convenience only and shall not affect in any way the meaning of this Agreement or its interpretation.

## Integrated Agreement

6.07.   This Agreement constitutes the entire Agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this Agreement.

7

IN WITNESS WHEREOF, this Agreement has been executed effective as of August 22, 2014.

PLEDGER:

**JACQUELYN MARIE WALLACE 1996 SUB-S TRUST**

David G. Wallace, Trustee

SECURED PARTY:

NEAL JAIN, individually and as Agent for the Lenders

ACKNOWLEDGED AND AGREED:

David Gordon Wallace, Debtor

8

**EX. B - 046**

## EXHIBIT A

| Company | % Membership Interest |
|---------|----------------------|
| Rink Operations Management, LLC | 16.665% |

## SECURITY AGREEMENT-PLEDGE
(David G. Wallace)

## ARTICLE I

## GENERAL RECITALS

Identification of Parties

1.01.    This is a security agreement-pledge (the "Agreement") between the **DAVID GORDON WALLACE,** whose residence address is 1634 Brookstone Land, Sugar Land, Texas 77479, referred to in this Agreement as "Pledger", and **NEAL JAIN,** an individual whose address is 17 St. Peters' Walk, Sugar Land, Texas  77479, as Agent on behalf of the Lenders, as such terms are defined in that certain Agency Agreement dated as of the effective date hereof among Agent and such Lenders, referred to in this Agreement as "Secured Party".

Debt

1.02.    David Gordon Wallace ("Debtor") has executed and delivered that certain promissory note dated August 22, 2014, in the principal sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) and payable to the Lenders, referred to in this Agreement as the "Promissory Note".  The proceeds of the loan evidenced by the Promissory Note will be invested in a project that will benefit Pledger's financial interests and value of its equity interest in Wallace Bajjali Development Partners, LP, a Texas limited partnership. Accordingly, Pledger has determined that it is in its best interest to provide collateral to secure the Promissory Note.

Nature of Agreement

1.03.    Debtor and Secured Party desire that Pledger grant to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement as collateral for Debtor's performance of the terms and conditions of the Promissory Note and other obligations set forth in this Agreement.

THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, the Pledger and Secured Party agree as follows:

ARTICLE 2

PLEDGE

<u>Security Interest</u>

2.01.  Pledger creates and grants to the Secured Party a security interest in the Collateral described in Paragraph 2.02 of this Agreement to secure the payment and performance of the Obligations of Debtor to the Secured Party set forth in Paragraph 2.03 of this Agreement.

<u>Description of Collateral</u>

2.02.

(a)     This Agreement creates a security interest in favor of Secured Party in all of the membership interests owned by the Pledger in the limited liability companies set forth on Exhibit A attached hereto (the "<u>Interests</u>").

(b)     All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "<u>Collateral</u>").

<u>Obligations Secured</u>

2.03.  The security interest created by this Agreement secures the following:

(a)     Payment of the indebtedness evidenced by, and performance and discharge of every covenant, condition, and agreement contained in the Promissory Note, and any and all modifications, extensions, or renewals of the Promissory Note (the "<u>Obligations</u>").

(b)     Performance and discharge of every obligation, covenant, and agreement of Pledger contained in this Agreement.

<u>Representations and Warranties of Pledger</u>

2.04.

(a)     Pledger hereby represents and warrants that the Collateral is free and clear of any security interests, liens, restrictions, or encumbrances, other than the security interest created by this Agreement, and that Pledger has full right and power to transfer the Collateral to the Secured Party free and clear of any interests described in this paragraph, and to enter into and carry out this Agreement.

2

(b)     Pledger has not heretofore signed any financing statement, and no financing statement is now on file in any public office covering the Collateral.  Pledger authorizes Secured Party to file, in jurisdictions where this authorization will be given effect, a financing statement signed only by Secured Party covering the Collateral; and at the request of Secured Party, Pledger will join Secured Party in executing one or more financing statements, pursuant to the Uniform Commercial Code, in form satisfactory to Secured Party.

(c)     Pledger will not sell, transfer or dispose of any portion of the Collateral unless Secured Party consents to such sale, transfer or disposition in writing, in advance.

(d)     Pledger shall, at his own expense, do, make, procure, execute and deliver all acts, things, writings and assurances as Secured Party may at any time reasonably request to protect, assure or enforce its interests, rights and remedies created by, provided in, or emanating from, this Security Agreement.

(e)     Pledger shall keep the Collateral, including any proceeds therefrom, free from unpaid charges, including taxes, and from liens, encumbrances and security interests other than that of Secured Party.

ARTICLE 3

DEFAULT; RIGHTS OF SECURED PARTY

Occurrence of Default

3.01.     As used in this Agreement, "Occurrence of Default" shall be any or all of the following:

(a)     The failure of Pledger punctually and completely to observe, keep, or perform any covenant, agreement, or condition required by this Agreement.

(b)     The failure of Debtor punctually to pay the indebtedness evidenced by the Promissory Note in accordance with its terms.

(c)     Consent by Debtor or Pledger to the appointment of a receiver or liquidator of itself or of any substantial portion of its assets.

(d)     The seizure by a receiver, trustee, or other officer appointed by any court, or by any sheriff, marshal, or other similar governmental officer, under color of legal authority, of any substantial portion of the assets of Pledger or Debtor and holding possession of the assets for a period of thirty (30) days.

3

(e)     The assumption of jurisdiction, custody, or control of any of the assets of Pledger or Debtor under the provisions of any presently existing or future law providing for reorganization, dissolution, liquidation, or winding up of corporations or other legal entities, if Pledger has not been restored to custody and control of the assets within thirty (30) days after the date of the assumption.

(f)     If a final judgment for the payment of money shall be rendered against Pledger or Debtor and, within thirty (30) days after the entry of the judgment, it has not been discharged or execution of the judgment has not been stayed pending appeal, or if, within thirty (30) days after the expiration of any stay, the judgment has not been discharged.

<u>Secured Party's Rights and Remedies</u>

3.02.   Secured Party shall have all of the following rights regardless of the existence of any Occurrence of Default.

(a)     This Agreement, Secured Party's rights hereunder, or the indebtedness hereby secured may be assigned from time to time.

(b)     Secured Party may execute, sign, endorse, transfer or deliver in the name of Pledger any documents, necessary to evidence, perfect or realize upon the security interest and obligations created by this Agreement.

(c)     Secured Party shall have no liability with respect to the Collateral, including, without limitation, any obligation for cash calls.

3.03.   Upon an Occurrence of Default, the Secured Party may foreclose the security interest in either of the following ways:

(a)     Provided that the Secured Party gives notice to the Pledger, and the Pledger fails to object within twenty one (21) days of receipt of such notice, the Secured Party may retain, in satisfaction of Pledger's Obligations, all of the Collateral.

(b)     Secured Party may declare all Obligations secured hereby immediately due and payable and shall have the rights and remedies of a Secured Party under the Uniform Commercial Code of Texas, including without limitation thereto, the right to sell, at public or private sale or sales, or otherwise dispose of or utilize the collateral and any part or parts thereof in any manner authorized or permitted under the Uniform Commercial Code after default by a Pledger, at such prices and on such terms as Secured Party may deem reasonable under the circumstances. Secured Party shall have the right to take possession of all or any part of the Collateral and of all books, records, papers and documents in Pledger's possession or control relating to the Collateral which are not already in Secured Party's possession, and for such purpose may enter upon any premises upon which any of the Collateral or any security therefor

4

or any of said books, records, papers and documents are situated and remove the same therefrom. Unless the Collateral threatens to decline in value or is of a type customarily sold on a recognized market Secured Party will send Pledger reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to be made. The requirement of sending reasonable notice shall be met if such notice is mailed, postage prepaid, to Pledger at the address designated on the first page of this Security Agreement (or at such other address as Pledger shall have designated as its address for receipt of notices hereunder in a writing duly received by Secured Party) at least ten (10) days before the time of the sale or disposition. Expenses of retaking, holding, selling or the like shall include Secured Party's reasonable attorney's fees and legal expenses, and Pledger agrees to pay such expenses, plus interest thereon at the maximum rate permitted by applicable law from the date such expenses are incurred until repaid. Pledger shall remain liable for any deficiency.

(c)     No delays or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of any such right or any other right. A waiver on any one or more occasions shall not be construed as a bar or waiver of any right or remedy on any future occasion. The remedies of Secured Party hereunder are cumulative, and the right exercise of any one or more of the remedies provided for herein shall not be construed as an election or as a waiver of any of the other remedies of Secured Party provided for herein or existing by law or otherwise.

<u>Additional Agreements</u>

3.04

(a)     The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and future additional security to be considered as cumulative security. Any of the Collateral may be released from this Agreement without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a first and prior lien, security interest and charge on all of the Collateral not expressly released, until all the Obligations secured hereby have been paid in full. Any future assignment or attempted assignment of the interest of Pledger in and to any of the Collateral shall not deprive Secured Party of the right to see or otherwise dispose of or utilize all of the Collateral as above provided or necessitate the sale or disposition thereof in parcels or in severalty.

(b)     This Agreement shall not be construed as relieving Pledger from full personal liability on the Obligations secured hereby and for any deficiency thereon.

5

## ARTICLE 4

## VOTING; DIVIDENDS AND DISTRIBUTIONS

### Voting

4.01.   For as long as the Interests are held by Secured Party, and until the date of an Occurrence of Default, if any, the Pledger shall have the right to vote the Interests for all purposes. If requested by the Pledger, the Secured Party shall execute and deliver to the Pledger any proxies and authorizations reasonably required to confirm the voting rights of the Pledger during this period.

### Distributions

4.02.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, all distributions paid in connection with the Interests shall belong to the Pledger.

### Voting Trust

4.03.   For as long as the Interests are held by the Secured Party, and until the date of an Occurrence of Default, if any, Pledger shall have the right to assign the Collateral to a voting trust. In the event Pledger makes such an assignment, the Secured Party shall accept certificates of the voting trust in substitution for the Collateral.

## ARTICLE 5

## RELEASE OF COLLATERAL

### Release of Collateral

5.01.   Pledger shall, upon payment in full of the Promissory Note, be entitled to a release of Collateral.

## ARTICLE 6

## MISCELLANEOUS

### No Waiver of Right of Remedies

6.01.   No failure or delay by Secured Party in exercising any right, power, or privilege given by any provision of this Agreement shall operate as a waiver of the provision.

6

Additionally, no single or partial exercise of any right, power, or privilege shall preclude any other or further exercise of that or any other right, power, or privilege.

Severability

6.02.    Should any one or more of the provisions of this Agreement be determined to be illegal or unenforceable, all other provisions of this Agreement shall be valid, binding, and effective as if the illegal or unenforceable provisions had never been included in this Agreement.

Notices

6.03.    Any notices of other communications required or permitted by this Agreement shall be delivered personally or sent by registered or certified mail, postage prepaid to 1634 Brookstone Land, Sugar Land, Texas 77479 for Pledger and 17 St. Peters' Walk, Sugar Land, Texas 77479 for Secured Party, or at any other address furnished in writing by either party to the other, and shall be deemed to have been given as of the date the notice is personally delivered or deposited in the United States mail.

Assignment by Secured Party

6.04.    This Agreement and the security interest created by this Agreement shall be assignable by the Secured Party, and shall inure to the benefit of Secured Party's heirs, executors, or administrators, and shall be binding upon the Pledger and his or her heirs, executors, administrators, legal representatives, successors, and assigns.

Choice of Law

6.05.    It is the intention of the parties that the laws of Texas should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

Paragraph Headings

6.06.    Paragraph and other headings contained in this Agreement are for purposes of reference and convenience only and shall not affect in any way the meaning of this Agreement or its interpretation.

Integrated Agreement

6.07.    This Agreement constitutes the entire Agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this Agreement.

7

**EX. B - 054**

IN WITNESS WHEREOF, this Agreement has been executed effective as of August 22 2014.

PLEDGER:

_____
David Gordon Wallace

SECURED PARTY:

_____
NEAL JAIN, individually and as Agent for the
Lenders

ACKNOWLEDGED AND AGREED:

_____
David Gordon Wallace, Debtor

8

## EXHIBIT A

| Company | % Membership Interest |
|---|---|
| Sugar Land Rink Lenders, LLC | 33.33% |

**UCC FINANCING STATEMENT**
**FOLLOW INSTRUCTIONS**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Ewing & Jones, PLLC 713-590-9600 |

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
USA

**FILING NUMBER:** 15-0012149043
**FILING DATE:** 04/21/2015     03:12 PM
**DOCUMENT NUMBER:** 602939730005
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | **JACQUELYN MARIE WALLACE 1996 SUB-S TRUST** | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **13131 Dairy Ashford, Suite 175** | **Sugar Land** | **TX** | **77478** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | **Jain** | **Neal** | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **17 St. Peters' Walk** | **Sugar Land** | **TX** | **77479** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(a) This Agreement creates a security interest in favor of Secured Party in all
of the membership interests owned by the Pledger in Rink Operations Management,
LLC (the "Interests").

(b) All right, title and interest of the Pledger, whether now owned or hereafter
acquired, in and to the Pledger's right to receive profits, income, proceeds,
monies and distributions, arising, directly or indirectly out of the Pledger's
interest in the Interests (together with the Interests, collectively referred to
as the "Collateral").

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:          6b. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**EX. B - 057**

**UCC FINANCING STATEMENT**

**FOLLOW INSTRUCTIONS**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Ewing & Jones, PLLC 713-590-9600 |

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
USA

**FILING NUMBER:** 15-0012147768
**FILING DATE:** 04/21/2015       03:06 PM
**DOCUMENT NUMBER:** 602939730004
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|---|
|  | **JACQUELYN MARIE WALLACE 1996 TRUST** |  |  |  |  |
|  | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) |  | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |  | COUNTRY |
| **13131 Dairy Ashford, Suite 175** | **Sugar Land** | **TX** | **77478** |  | **USA** |

2. DEBTOR'S NAME - Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
|  | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only <u>one</u> Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
|  | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|  | **Jain** | **Neal** |  |  |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **17 St. Peters' Walk** | **Sugar Land** | **TX** | **77479** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(a) This Agreement creates a security interest in favor of Secured Party in all of the partnership interests owned by the Pledger in Sugar Land Entertainment Enterprises, LP, a Texas limited partnership, consisting of 160,000 Class B Units of partnership interest (the "Interests").

(b) All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "Collateral").

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check <u>only</u> if applicable and check <u>only</u> one box:                     6b. Check <u>only</u> if applicable and check <u>only</u> one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility     ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**EX. B - 058**

**UCC FINANCING STATEMENT**

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Ewing & Jones, PLLC 713-590-9600

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
USA

**FILING NUMBER:** 15-0012138374
**FILING DATE:** 04/21/2015      02:43 PM
**DOCUMENT NUMBER:** 602939730003
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | |
|---|---|
| OR | **1a. ORGANIZATION'S NAME**<br>**WHITNEY LEIGH WALLACE 1996 SUB-S TRUST** |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **13131 Dairy Ashford, Suite 175** | **Sugar Land** | **TX** | **77478** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | |
|---|---|
| OR | **2a. ORGANIZATION'S NAME** |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | |
|---|---|
| OR | **3a. ORGANIZATION'S NAME** |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| **Jain** | **Neal** | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **17 St. Peters' Walk** | **Sugar Land** | **TX** | **77479** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(a) This Agreement creates a security interest in favor of Secured Party in all
of the membership interests owned by the Pledger in Rink Operations Management,
LLC (the "Interests").

(b) All right, title and interest of the Pledger, whether now owned or hereafter
acquired, in and to the Pledger's right to receive profits, income, proceeds,
monies and distributions, arising, directly or indirectly out of the Pledger's
interest in the Interests (together with the Interests, collectively referred to
as the "Collateral").

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**EX. B - 059**

**UCC FINANCING STATEMENT**
**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Ewing & Jones, PLLC 713-590-9600

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Ewing & Jones, PLLC
6363 Woodway, Suite 1000
Houston, TX 77057
USA

**FILING NUMBER:** 15-0012137242
**FILING DATE:** 04/21/2015      02:38 PM
**DOCUMENT NUMBER:** 602939730002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | WHITNEY LEIGH WALLACE 1996 TRUST | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 13131 Dairy Ashford, Suite 175 | Sugar Land | TX | 77478 | USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | Jain | Neal | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17 St. Peter's Walk | Sugar Land | TX | 77479 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
(a) This Agreement creates a security interest in favor of Secured Party in all of the partnership interests owned by the Pledger in Sugar Land Entertainment Enterprises, LP, a Texas limited partnership, consisting of 160,000 Class B Units of partnership interest (the "Interests").

(b) All right, title and interest of the Pledger, whether now owned or hereafter acquired, in and to the Pledger's right to receive profits, income, proceeds, monies and distributions, arising, directly or indirectly out of the Pledger's interest in the Interests (together with the Interests, collectively referred to as the "Collateral").

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:                                                                    6b. Check only if applicable and check only one box.
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility        ☐ Agricultural Lien   ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**EX. B - 060**